**James C. SHEEHAN, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. 01 Civ. 9182CSH.**

United States District Court, S.D. New York.

March 17, 2005.

Gina M. Sgarlato, Richard J. Sgarlato PC, Staten Island, NY, for plaintiff.

Carl J. Schaerflester, Schwab, Katz And Dwyer LLP, New York, NY, for defendant.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

In this action governed by the Employee Retirement and Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), plaintiff James C. Sheehan sues defendant Metropolitan Life Insurance Company ("MetLife") to recover unpaid disability benefits allegedly due since March 31, 2001, the date MetLife terminated Sheehan's benefits under an insurance policy ("the Policy," "the Disability Plan," or "the Plan") MetLife issued to Sheehan's employer, Bear Stearns & Co. ("Bear Stearns"), and for a judicial declaration that MetLife is obligated by the Plan to make future benefits payments to Sheehan on account of his continuing total disability. MetLife contends that it acted properly in terminating Sheehan's benefits in 2001, and that Sheehan is not presently disabled, so that it owes Sheehan nothing. As required by ERISA, the case was tried to the Court without a jury. *See Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1259 (2d Cir.1996). The trial began on November 15, 2004, and concluded on November 19. This opinion recites the procedural history of the case and then sets forth the Court's findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

## I. PROCEDURAL HISTORY

Plaintiff Sheehan commenced this action in a New York State court. Defendant MetLife removed the action to this Court under 28 U.S.C. § 1441(a) and (b), identifying ERISA as the source of the Court's federal question original jurisdiction. Sheehan did not contest the removal; nor could he have successfully done so.

Following removal, the parties began pre-trial discovery. MetLife moved for a protective order with respect to certain of Sheehan's discovery demands. The motion required the Court to consider the permissible scope of discovery in an ERISA case such as this one. I resolved those disputes in an opinion reported at 2002 WL 1424592 (S.D.N.Y. June 28, 2002) (*"Sheehan I"*). Following further discovery, MetLife moved for summary judgment on the ground that the administrative record established its contentions that Sheehan was not totally disabled within the meaning of the Disability Plan on March 31, 2001 and is not disabled today. Sheehan cross-moved to supplement the record and for summary judgment determining that he was and is totally disabled. I decided those cross-motions in an opinion reported at 2003 WL 22290230 (S.D.N.Y. Oct.6, 2003) (*"Sheehan II"*).

In *Sheehan I*, which established the permissible discovery boundaries, I rejected the contention of MetLife that "the court in an ERISA case may review only the materials considered by the claim administrator." 2002 WL 1424592, at *1.[1] MetLife was the administrator of this Disability Plan within the ERISA context. Although MetLife is nominally an insurance company, "[i]f an insurance company controls the distribution of funds and decides whether or not to grant benefits under an employee benefit plan, then it can be sued as a plan administrator," *id.,* at *2 (citations omitted), an analysis applicable to MetLife because it made the initial determination that Sheehan was no longer disabled and subsequently rejected his appeal.

During the discovery disputes, MetLife acknowledged that a *de novo* standard of review presumptively applied in this Court, given the general rule that "[a] denial of benefits challenged under [ERISA § 502(a)(1) ] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.,* at *3 (citations omitted), but stated that "it has yet to uncover complete copies of the relevant plan documents." *Id.* Following Second Circuit cases, I held that Sheehan was entitled to documentary and deposition discovery on the issues of plan interpretation and the existence *vel non* of "a conflict of interest or other good cause" entitling Sheehan "to present evidence outside the record on the issue of his physical condition." *Id.,* at *4 (citations omitted).

In *Sheehan II,* I denied the parties' cross-motions for summary judgment because triable issues of fact precluding summary disposition existed with respect to Sheehan's medical condition (1) when MetLife terminated his benefits and (2) at the present time. In the exercise of my discretion, I granted Sheehan's motion to supplement the administrative record with medical affirmations of his two treating physicians, a cardiologist and a psychiatrist, as well as other medical records whose existence Sheehan demonstrated in his motion papers but could not be found

---

1. In the case at bar, the "materials considered by the claim administrator" were collected in a loose-leaf volume compiled and maintained by MetLife and designated by it as "the claim file," a designation I will adopt throughout this opinion. The claim file was admitted into evidence as Pl.Ex. 5 at the trial.

in MetLife's claim file. I held that the requisite good cause for receiving evidence supplementing the administrative record arose out of (1) the conflict of interest inherent in MetLife's dual role as Plan administrator and insurer responsible for paying claims, and (2) the apparent incompleteness of the claim file compiled by MetLife. *Sheehan II*, 2003 WL 22290230, at *3–*4 (citing cases).

MetLife was never able to find the complete Policy and Plan it issued to Bear Stearns, either during pre-trial discovery or in response to a trial subpoena Sheehan served. That inability is puzzling. For present purposes, it is sufficient to say that since MetLife as plan administrator "bears the burden of proving that the deferential standard of review applies," *Sheehan I*, 2002 WL 1424592, at *3, and MetLife's failure of proof in that regard is total, the Court will (1) review *de novo* the validity of MetLife's termination of Sheehan's disability benefits in March 2001, and (2) decide whether Sheehan is entitled to a declaration of present total disability and continued disability payments by MetLife under the Plan.

## II. FINDINGS OF FACT

### A. Preliminary

1. Plaintiff James C. Sheehan was born on February 2, 1946. On February 2, 2005 he became 59 years of age.

2. In 1994 Sheehan was employed by Bear Stearns as a Senior Managing Director. On November 25 of that year he suffered cardiac symptoms while at the office. He advised the Bear Stearns nurse and was sent to the emergency room at Lenox Hill Hospital in Manhattan. Sheehan's cardiologist at the time, Rony Shimony, M.D., eventually made diagnoses of a myocardial infarction and stress.[2] Sheehan presently complains of cardiac and psychiatric symptoms.

### B. The Disability Plan Provisions

3. I consider in detail *infra* the evidence with respect to Sheehan's cardiac and psychiatric conditions. But first I consider the evidence with respect to the terms and conditions of the Policy and Disability Plan issued by MetLife to Bear Stearns, of which Sheehan was a beneficiary at the time he became ill. There are two relevant documents. I will refer to them as "the Certificate" and "the Booklet."

4. The Certificate bears MetLife's logo and is comprised of a certification, an unnumbered table of contents, and seven pages which undertake to set forth the pertinent terms and conditions of the group policy MetLife issued to Bear Stearns. The copy of the Certificate included in the claim file did not include the seventh and last page. During an exchange at trial more fully described in ¶ 22, *infra*, counsel for Sheehan produced a complete copy of the Certificate, which was received in evidence as Pl.Ex. 41.

5. The certificate, on the cover page, recites that MetLife "[c]ertifies that, under

---

**2.** In his trial testimony, Sheehan was critical of the care he received after reporting his first symptoms. He believes that he should have been sent to a hospital nearer to the Bear Stearns office than Lenox Hill, and that he had to wait too long for Dr. Shimony to appear to treat him, so that the myocardial infarction (in lay terms, "heart attack") he suffered could have been prevented. It appears from pre-trial collogues between the Court and counsel that Sheehan filed a medical malpractice suit arising out of these circumstances in this Court, before another District Judge. Those particular events are not relevant to the case at bar, except to the extent that they have contributed and presently contribute to Sheehan's mental and emotional condition, which is at issue between the parties to this action.

and subject to the terms and conditions of the Group Policy issued to the Employer, coverage is provided for each Employee as defined herein," and that the dates "when an Employee is eligible for coverage" and "when an Employee's Personal Benefits becomes [*sic*] effective" and "the amounts of coverage" are "determined by the form." The "form" evidently refers to the pages attached to the certification which together comprise the Certificate.

6. The certification by MetLife that I have quoted in the preceding paragraph would certainly suggest the existence of an underlying Group Policy between MetLife and Bear Stearns, to whose terms and conditions the coverage proclaimed by the Certificate is explicitly made subject. But MetLife has been never been able to find and produce such a policy, notwithstanding discovery demands and a trial subpoena. Bear Stearns has been asked and cannot find a policy. The State agency regulating insurance matters, which counsel for plaintiff says should have a copy, has been asked and cannot find it. Counsel for plaintiff make much of this non-production. I am asked to draw an inference adverse to MetLife with respect to the provisions governing Sheehan's entitlement to benefits. I decline to do so. I accept the trial testimony of Laura Sullivan, a MetLife executive for 16 years, that a disability policy, as differentiated from a certificate, does not contain any of the terms of coverage; that certificates are generally attached to policies and contain the terms of coverage; that the policy contains nothing of interest or relevance to a beneficiary's claim under the policy; and that "[t]he group policy generally will show the effective date of coverage. It may include the application. It sets forth the financial provisions, the amount of premium for covered payroll, and it includes then a schedule of exhibits which identifies

the certificates and amendments that's relevant." Tr. 418–19.[3] In her considerable experience, Sullivan has "not seen a group policy that contains any provisions or terms of the plan that are relative to the adjudication of a claim." Tr. 419. Accordingly I find that the Certificate in evidence contains the relevant governing provisions of the Policy or the Plan, words that are sometimes used interchangeably. In that circumstance there is no basis for drawing an inference adverse to MetLife for spoliation of evidence, which requires a showing that a party destroyed evidence which is relevant to an opposing party's claim or defense and is otherwise unavailable. *See Residential Funding Corp. v. DeGeorge Fin. Corp., et al.*, 306 F.3d 99, 107 (2d Cir.2002).

7. MetLife's position, which for the foregoing reasons I accept, is that the terms and conditions governing Sheehan's entitlement to disability benefits are those found in the Certificate. Specifically, MetLife contends that the provisions relevant to Sheehan's claim appear in the Certificate at pages 3–6, under the caption "Long Term Disability Benefits." It is necessary to analyze those provisions in detail.

8. The provisions dealing with Long Term Disability Benefits are divided into sections, as follows: "1. Definitions"; "2. Coverage"; "3. Amount"; "4. Payments of Benefits"; and unnumbered sections captioned "Claim Procedure For Long Term Disability Benefits," "When Benefits End," and "Notices." The provisions particularly pertinent to Sheehan's claim appear in the sections captioned Definitions and Coverage.

9. The Definitions section provides in ¶ 1:

---

3. The designation "Tr." refers to pages of the trial transcript.

A. "Full Disability" or "Fully Disabled" means that because of a sickness of an injury you can not do your job.

B. "Total Disability" or "Totally Disabled" means that because of a sickness or an injury:

(1) You can not do your job; and

(2) You can not do any other job for which you are fit by your education, your training or your experience.

¶ 1.C. provides in part:

"Period of Disability" means any one continuous period of time during which you are Fully Disabled and/or Totally Disabled because of one or more causes.

¶ 1.D. provides in part:

"Waiting Period" means with respect to each Period of Disability, the first 90 days that you are Fully Disabled and/or Totally Disabled.

¶ 1.E. provides in part:

"Terminal Date" means, in the case of a disability beginning: (1) before age 62, the later of:

(a) your 65th birthday; and

(b) the date 36 Monthly Benefits have been paid to you.

¶ 1.G. provides:

"Primary Benefit Period" means, with respect to a Period of Disability, the period of time, if any, which starts on the day after the end of the Waiting Period and which ceases on the earliest of:

(1) the day 24 months after that Waiting Period ends; and

(2) the day that Period of Disability ends; and

(3) your Terminal Date.

¶ 1.H. provides:

"Secondary Benefit Period" means, with respect to a Period of Disability, the period of time, if any, which starts on the day after the end of a Primary Benefit Period and ceases on the earlier of:

(1) your Terminal Date; and

(2) the day that Period of Disability ends.

In the case at bar, in February 1995, at the end of the 90–day Waiting Period, MetLife began paying Sheehan monthly disability benefit payments. Those payments reflect MetLife's acknowledgment that Sheehan was "fully disabled" as that phrase is defined in the Certificate, and thus eligible to receive benefits during the Primary Benefit Period, which lasted 24 months. At the end of that Period, MetLife continued paying Sheehan benefits, thereby reflecting MetLife's acknowledgment that Sheehan was "totally disabled" as that phrase is defined in the Certificate, and thus eligible to receive benefits during the Secondary Benefit Period, which under the terms of the Certificate lasts "while that Total Disability continues to exist" and until Sheehan reaches his 65th birthday. MetLife terminated Sheehan's benefits on March 31, 2001, on the ground that he was no longer totally disabled, thereby precipitating this action.

10. The provision in the Certificate central to the dispute is found in the Coverage section, which provides in ¶ 2.2.:

We will pay Monthly Benefits during the Secondary Benefit Period:

(a) if you are Totally Disabled on the day after the end of the Primary Benefit Period; and

(b) while you are under the care of a Doctor for that Total Disability; and

(c) *while that Total Disability continues to exist;* and

(d) if you have not then attained your Terminal Date; *except that no Monthly Benefits will be paid:*

. . . . .

(ii) *for any part of the Secondary Benefit Period during which you are not confined as an inpatient in a Hospital,*

*if your Total Disability in any way results from, or is caused or contributed to by a mental or nervous disorder.* (emphasis added).

11. MetLife contends that these provisions in the Certificate form are binding on Sheehan and that it properly terminated Sheehan's benefits in March 2001 because at that time Sheehan was no longer totally disabled as that term is defined in the form, or, if he was, the disability resulted from, or was caused or contributed to by a mental or nervous disorder, with the result that ¶ 2.2.(ii), the last-quoted provision, relieves MetLife of any obligation to pay Sheehan monthly benefits during the balance of the Secondary Benefit Period, which would otherwise have terminated upon Sheehan's 65th birthday.

12. The second document relevant to Sheehan's disability coverage is what I have called the Booklet. It is a printed booklet that Sheehan testified he received while working at Bear Stearns. The Booklet was received in evidence as Pl.Ex. 42 after a skirmish between counsel recounted more fully in ¶¶ 14–18, *infra.* The cover displays the phrases "Bear Stearns," "Disability Benefits," and "Summary Plan Description." As more fully discussed in Part III, *infra,* that last phrase tracks the ERISA statute, which requires the employers or administrators of any employee benefit plan to furnish employees with a summary of the plan's provisions—an "SPD," in ERISA parlance, which stands for "summary plan description." As noted, the Booklet proclaims itself upon its cover to be a "Summary Plan Description."

13. Plaintiff's counsel attempted to introduce the Booklet into evidence during his examination of Laura Sullivan, currently employed as a "business consultant" with MetLife. Tr. 343. In that capacity,

Sullivan is thoroughly familiar with the sort of disability policies MetLife issues to employers and the documents such policies generate.[4] Sullivan, subpoenaed by counsel to testify in plaintiff's case in chief, was technically a "hostile witness" as that phrase is used in Rule 611(c), Fed.R.Evid., and accordingly counsel interrogated her by leading questions, as the Rule allows. However, Sullivan did not display during her testimony any hostility to Sheehan capable of compromising her oath to testify truthfully. On the contrary, Sullivan impressed me as an intelligent, articulate, candid and forthright witness, whose testimony I accept.

14. Sullivan identified the Certificate as the certificate of insurance MetLife issued to Bear Stearns, and it was received in evidence without objection as Pl.Ex. 41. Tr. 344–345. Sullivan initially testified to her belief (she had no actual knowledge of what occurred at Bear Stearns) that the Certificate "was distributed to employees as well, which would, in my opinion, render it also a summary plan description." Tr.344. Counsel for Sheehan then showed Sullivan the Booklet, at that time marked Pl.Ex. 42 for identification only. Sullivan testified that she had never seen it before, and added:

> A. I've never seen this particular document. I have seen summary plan descriptions for group long-term disability policies before.
>
> Q. [by counsel for plaintiff] So that is a summary plan description, is that correct?
>
> A. Correct.

Tr. 345–346.

15. Toward the end of Sullivan's testimony, I pursued with her the nature and

---

4. It is useful to note that Sullivan is not an *outside* "business consultant" at MetLife. She is an employee of the company, and has been for 16 years. Tr. 418.

purpose of a booklet such as P.Ex. 42. This exchange followed:

THE COURT: What is a plan booklet?

THE WITNESS: A plan booklet is generally, it's generally the certificate of insurance. It may have the specific employer cover on it and be utilized as a summary plan description as well. It's usually the certificate that sets forth the terms of the disability plan.

THE COURT: So, is it your testimony that a certificate of insurance and a plan booklet are two names for the same document?

THE WITNESS: Quite often, yes.

THE COURT: Quite often, but not always?

THE WITNESS: Not always, correct.

THE COURT: All right. So sometimes, in some cases, you have both a certificate of insurance of the sort that we've looked at earlier, that begins on page 0595 [of P.Ex. 5], and, in addition to that document called a certificate of insurance, there can also be a different document called a plan booklet, is that correct?

THE WITNESS: Yes.

THE COURT: Are you aware of any practice or procedure under which—withdrawn, any practice or procedure dealing with when plan booklets are distributed in addition to a certificate of insurance and when they are not?

THE WITNESS: No, I'm not aware.

THE COURT: Just happens sometimes in your experience?

THE WITNESS: I think it would generally be one or the other. I can't think of a situation where they would both be distributed.

THE COURT: To the employees?

THE WITNESS: Correct. A booklet would generally take the place of the certificate.

THE COURT: So from the employee's point of view, who is interested in this kind of coverage and who wants to get a document describing it, in your view, that employee would get either a certificate of insurance or a plan booklet, if they both exist, but would not be expected to get both of them, is that fair to say?

THE WITNESS: I think that's fair to say.

Tr. 411–413.

16. On what was technically cross-examination, counsel for MetLife elicited from Sullivan testimony that the terms of coverage of the disability plan applicable to Bear Stearns and an employee such as Sheehan were contained in the Certificate. Tr. 418–420. That testimony brought counsel for Sheehan on re-direct of Sullivan back to the Booklet, still languishing as Pl.Ex. 42 for identification only. This testimony then transpired:

Q. (by counsel for plaintiff) (addressing the Court) Judge, we have a document that's been marked as Plaintiff's Exhibit 42 for identification, and this is a—(addressing the witness) I believe you told me that this is a summary plan description, is that correct?

A. Yes.

＊　　＊　　＊　　＊　　＊　　＊

THE COURT: Is Plaintiff's Exhibit 42 for identification a plan booklet?

THE WITNESS: Yes.

THE COURT: It is?

THE WITNESS: Yes.

THE COURT: So now we have an honest-to-God plan booklet right in this courtroom, is that so?

THE WITNESS: Yes, sir.

THE COURT: And you also think it's the SPD in this case for this policy?

THE WITNESS: Yes.

Tr. 436, 438–439. Counsel for Sheehan thereupon offered the Booklet into evi-

dence. That offer failed because counsel for MetLife brought out on the *voir dire* that while Sullivan was "positive" that the Booklet was an SPD, she was not "positive" that the Booklet was the SPD in effect on the date Sheehan went on disability, "because there's no date in it." Tr. 439. Counsel for MetLife pressed his objection to admitting the Booklet. I sustained the objection on the then-existing record, saying to counsel for Sheehan that "you'll have to lay the last brick in your foundation." Tr. 439.

17. That brick was laid by plaintiff Sheehan himself, the last witness called on his case in chief. Sheehan testified on direct examination:

Q. I want to show you this document that's been marked Plaintiff's Exhibit 42, for identification. Can you tell me, have you ever seen that document before?

A. Yes, I did.

Q. And where did you see that document?

A. At Bear Stearns. That's my summary plan description.

Q. When did they give that to you?

A. Sometime after 1985, when I came back to the firm.

Q. Was it before you went out on disability?

A. Yes.

Q. So somewhere—

A. I'm talking about '86 or '85, '87, somewhere in there.

Q. Did they ever give you another one?

A. No.

Q. Was that the only one?

A. That's the only one.

Tr.451–452. Counsel for Sheehan thereupon re-offered the Booklet into evidence. Counsel for MetLife objected, stating that "I don't think there's an adequate foundation that's the one that's in effect on the date," and adding "but, you know, I know

the Court will do what it will do." Tr. 452. Notwithstanding that surly aside, I asked counsel if he wished to inquire on the *voir dire.* "Well," counsel responded, "I might as well ask a few." The following then transpired:

Q. (by counsel for MetLife): Do you know if Bear Stearns—do you know who prepared this document?

A. I don't know. They just distributed it to everybody in the office.

Q. Who distributed it?

A. The firm.

Q. Who at the firm?

A. I don't know who prepared it, but I know it was distributed in Bear Stearns.

Q. Do you know on what date you received it?

A. Not exactly what date. At sometime after I got back there in 1985, '86, maybe. But they came in envelopes around to everybody.

Q. And where was this document kept?

A. Where did I keep it?

Q. Where did you keep it?

A. In my files at home.

Q. When did you take it home?

A. Same day.

Q. And it stayed in your files for all that period?

A. That's correct.

Tr. 453–454. Counsel for MetLife pressed an objection based upon insufficient foundation. I overruled the objection and received the Booklet into evidence as Pl.Ex. 42. In anticipation of the possibility of an appellate review, I will state my reasons for doing so.

18. Sheehan offered the Booklet as the SPD he was given by Bear Stearns while he was an employee at the firm and prior to his illness. It was his burden to show that the document was what he professed it to be. This is known as "laying a foun-

dation" for admission of a document or other object into evidence. If there had been any question about the sufficiency of the foundation for admitting the Booklet into evidence before counsel for MetLife conducted his *voir dire*—and in my judgment there was none—the *voir dire* remedied it. The testimony I have just quoted makes it crystal clear that the Booklet was an SPD given to Sheehan by Bear Stearns before Sheehan suffered his heart attack. Sheehan took it home and kept it in his files, and accordingly was able to hand it to his counsel when the litigation began.

19. The parties apparently dispute whether the Booklet was the only document describing the coverage furnished to Sheehan (as his testimony can be read to assert) or whether he was also furnished with a copy of the Certificate (as MetLife contends). I have quoted in ¶ 17 Sheehan's testimony that the Booklet is "my summary plan description" which Bear Stearns gave to him sometime after 1985. He also testified that Bear Stearns never gave him "another one" and that P.Ex. 42 was "the only one" given to him. This testimony is not entirely clear. Sheehan may have been saying this document was the only SPD *booklet* Bear Stearns gave him, a fact not necessarily inconsistent with Bear Stearns having also given its employees copies of the *certificate,* a document which Sheehan may not have recognized as another form of SPD (although Sullivan testified that such certificates of insurance, if distributed to employees, perform the function of an SPD). On the other hand, Sheehan's testimony may be read as four-square denial that he received any document dealing with disability coverage other than the Booklet.

20. Although MetLife contends that Sheehan is bound by the terms of the Certificate, at trial counsel for MetLife made no effort to demonstrate that the Certificate was distributed to Bear Stearns employees. During cross-examination, Tr. 470–483, MetLife's counsel asked Sheehan no questions about what documents Bear Stearns gave him. Counsel did not confront Sheehan with the Certificate, although it was in evidence, to ask Sheehan if he had received a copy while at Bear Stearns. Counsel did not call a personnel representative from Bear Stearns to describe what documents relevant to its group plan with MetLife were given to employees at the pertinent times.

21. The proposition that Sheehan received from Bear Stearns only the SPD Booklet and not the Certificate is supported by the testimony of MetLife's employee Laura Sullivan that she could not "think of a situation" where both a certificate of disability insurance and a plan booklet would be distributed to employees, since for the employees "[a] booklet would generally take the place of the certificate." Tr. 412. This evidence of the routine practice of MetLife and the employers to who it issued disability policies, given by a credible witness with knowledge of the practice, "is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Fed. R.Evid. 406.

22. However, the proposition that Sheehan received a copy of the Certificate while at Bear Stearns is inferentially supported by the fact that, as noted in ¶ 4, his counsel was in a position to produce at trial a complete copy of the Certificate of insurance, including the last page, missing from the copy produced by MetLife. That production occurred at the beginning of the trial, when I addressed a subject previously raised *in limine* by saying in part: "What is crystal clear under the [Second Circuit] cases, it seems to me, is that if there is a difference between the SPD and

the plan in respect of benefits and the SPD is more favorable to the employee than the plan, then the SPD will trump the plan every time. It controls." Tr. 6. My comment led to a discussion involving counsel about what documents would be introduced and relied upon during the trial. Mr. Schaerf, counsel for MetLife, said: "[W]e have a certificate, which we now have a complete copy of, thanks to Mr. Sgarlato [counsel for Sheehan] and his client. The certificate was distributed to all employees, and we've treated that as if it was an SPD." Tr. 9.[5] Mr. Sgarlato replied on behalf of Sheehan:

Judge, just to clarify this a little further, we have the SPD, and I have discussed this with Mr. Schaerf, and he advised me that my—this booklet that the plaintiff received from his employer years ago is not the SPD. Now he sees it and I think he believes that this is the SPD. So I don't think there is any issue as to what the SPD is.

Now we have this other document that was produced by Mr. Schaerf absent the last page, *and my client had a copy with the last page.* So I've produced the last page to make this document complete.

Tr. 10 (emphasis added). Mr. Sgarlato's perception of Mr. Schaerf's agreement about the identity of the SPD was incorrect; Mr. Schaerf riposted:

Judge, maybe it's not a tempest in a teapot. The point is we have produced the certificate. I don't know what other document he assumes we would have, infers we would have, implies we would have. We produced the certificate. He's produced what he claims he's going to establish through his client is an SPD.

We think the certificate serves the purpose of an SPD because it was distributed to all employees.... [6] We've made full production. We produced the certificate of insurance, which does govern, unless the SPD trumps it, for whatever reason. And I don't see any conflict. Tr. 11–12.

23. A striking aspect of this exchange is Mr. Sgarlato's acknowledgment that Sheehan "had a copy [of the certificate] with the last page." One wonders how and when Sheehan came into possession of the Certificate. Was it while he was working at Bear Stearns, before he became ill? If so, did he receive the Certificate before or after he received the Booklet? Or did he receive the Certificate after his heart attack, which had led to his qualifying for disability insurance payments? The trial record does not contain evidence which answers those questions.

24. Another striking aspect of the trial evidence, previously noted, is that although counsel for MetLife twice asserted during the early colloquy with the Court that the Certificate "was distributed to all employees" by Bear Stearns, he made no effort to prove that assertion, either by questioning Sheehan on the point or calling a witness from Bear Stearns.

25. On this evidence, I find that the Booklet, Pl.Ex. 42, was distributed by Bear Stearns to Sheehan during his employment at the company and prior to his heart attack. I accept Sheehan's testimony on that point. I further find that Sheehan was and is entitled to regard the Booklet as an SPD issued in accordance with the mandate of ERISA, as more fully discussed in Part III, *infra.*

---

**5.** It is probably unnecessary to note that Mr. Schaerf was an advocate, not a witness, and his statement that "the certificate was distributed to all employees" does not constitute evidence that this occurred.

**6.** Again, this assertion by counsel does not constitute evidence.

26. As for the questions of whether Sheehan also received a copy of the Certificate and, if so, when and from whom he received it, I find myself unable on the basis of the trial evidence, and lack of evidence, to make findings of fact one way or the other. Sheehan's testimony may certainly be read as a denial that the Certificate was distributed to him at work; and Sullivan testified that if (as I have found) Sheehan received the Booklet, it is unlikely that he also received the Certificate. But there is a possible ambiguity in Sheehan's testimony, as noted in ¶ 19; and Sullivan's testimony may be read to mean that employees are given either a plan booklet or a certificate of insurance (but not both) before they become disabled, which is not inconsistent with their receiving a copy of the certificate after becoming disabled (an interpretation of my own, not suggested by counsel, which while plausible enough is speculation, not proof). On the other hand, counsel for Sheehan produced a complete copy of the Certificate at the start of the trial, stating that "my client had a copy with the last page." While counsel for MetLife did not follow up on this inviting lead when cross-examining Sheehan, Sheehan's possession of the Certificate standing alone supports the inference that someone (we know not who) gave it to him (we know not when). There is no preponderance of evidence on either side of these questions, and accordingly I cannot make findings of fact with respect to them.

27. The Booklet having been received in evidence, its relevant terms may be considered. Page 14 contains this paragraph:

**Mental or Nervous Conditions**

If your disability is the result of a mental or nervous condition, Supplemental Long Term Disability Plan benefits will be paid for a maximum of 24 months, unless you are hospitalized at the end of the 24–month period. If you are hospi-talized, benefits will continue as long as you remain in the hospital, up to the maximum period shown above.

That is the only reference in the Booklet to the effect of a beneficiary's "mental or nervous condition" upon his entitlement to benefits under the Plan.

C. **MetLife's Payments of Benefits to Sheehan and the Termination of Benefits**

28. Sheehan's last day working at Bear Stearns was November 25, 1994, when he suffered the heart attack. Benefits under the Plan became payable monthly to Sheehan on February 24, 1995, upon completion of the 90–day Waiting Period provided for by ¶ 1.D. of the Certificate, when the Primary Benefit Period provided for by ¶ 1.G. of the Plan began.

29. MetLife paid Sheehan benefits during the two-year Primary Benefit Period. In 1997 MetLife's staff considered whether to continue paying Sheehan benefits during the Secondary Benefit Period provided for by ¶ 1.H. of the Plan, which as noted begins "on the day after the end of a Primary Benefit Period" and ceases "on the earlier of: (1) your Terminal Date; and (2) the day that Period of Disability ends."

30. In considering whether to continue Sheehan's benefits into the Second Benefit Period, a process MetLife refers to as a "transition," the MetLife claims managers considered updated reports from Steven Charno, M.D., Sheehan's treating cardiologist, and Renato Prati, Jr., M.D., Sheehan's treating psychiatrist. In an internal memorandum dated May 22, 1997, a MetLife claims manager stated:

AGREE W/ CMS'S RATIONALE FOR APPROVAL BEYOND TRANSITION. CARDIAC AND PSYCHIATRIC STATUS WOULD PRECLUDE EE [em-

ployee] FROM SUSTAINED FULL TIME EMPLOYMENT.

REC: MONITOR CLAIM IN ONE YEAR FOR M/N AND CARDIAC STATUS.

MetLife claim file, Pl.Ex. 5, at Bates numbered pages AR 0495, 0497. "CMS" refers to a MetLife Case Management Specialist, apparently the MetLife employee who initially evaluates a disability claim. "M/N" presumably stands for "mental or nervous disorder," a benefits-disqualifying condition under ¶ 2.2.(d)(ii) of the Certificate. The author of the report and recommendation I have just quoted would appear to be the individual in the MetLife hierarchy to whom the Case Management Specialist assigned to Sheehan's claim reported. That individual's recommendation was approved at a higher level in MetLife, and Sheehan's benefit payments continued "beyond transition" from the Primary Benefit Period into the Secondary Benefit Period.

31. In a letter dated March 23, 2001, MetLife gave Sheehan notice that his benefits would be terminated on March 31, 2001. Pl.Ex. 5, at AR 0556–0561. That letter summarized MetLife's perceptions of Sheehan's medical records, as supplemented by records subsequent to 1997; advised Sheehan that MetLife had arranged for the video taping in April 1999, May 2000, and August 2000 of Sheehan's outdoor activities near his home in Florida (to which Sheehan had moved from Connecticut, his state of residence while employed by Bear Stearns); and that MetLife "had your medical records and the video tapes of your activity reviewed by an independent physician consultant board certified in Cardiology and Internal Medicine. In addition, we also had them reviewed by an independent physician consultant board certified in Psychiatry and Neurology." *Id.* at AR 0559. The cardiologist MetLife consulted was Dr. Parag Patel. His report appears at AR 0682–0688. The psychiatrist was Dr. Reginald

A. Givens. His report appears at AR 0688–0690. Neither Dr. Patel nor Dr. Givens examined Sheehan. They based their reports upon the medical records contained in the MetLife claim file. MetLife concluded its notice of termination by stating:

The review of medical records and surveillance tapes conclude [*sic*] that there is no objective medical evidence from a psychiatric perspective that would preclude you from return to work. In addition, the plan does not allow continuation of benefits beyond the Secondary Benefit Period (24 months after the Waiting Period ends) for a psychiatric condition.

In regards to your physical condition, the records confirm the myocardial infarction you suffered at the beginning of the claim. However, the medical records in addition to the surveillance information conclude that from a physical standpoint, you no longer meet the definition of disability. Therefore, benefits will terminate March 31, 2001.

*Id.,* at AR 0561. In the first of the two paragraphs I have quoted, MetLife is arguing in the alternative with respect to Sheehan's psychiatric condition as of March 23, 2001. MetLife takes the position that the psychiatric medical records do not show that Sheehan is disabled. But even if the records made such a showing with respect to a psychiatric condition as of March 23, 2001, MetLife states that "the plan does not allow continuation of benefits beyond the Secondary Benefit Period (24 months after the Waiting Period ends) for a psychiatric condition," a limited period of eligibility which in MetLife's view had run out. While MetLife's notice of termination does not cite to the provision of the Plan upon which that alternative assertion is based, undoubtedly the claims manager who wrote the March 23, 2001 letter had in mind ¶ 2.2(d)(ii) of the Certificate, which provides that "no Monthly Benefits will be

paid ... for any part of the Secondary Benefit Period during which you were not confined in a Hospital, if your Total Disability in any way results from, or is contributed to by a mental or nervous disorder." [7]

32. Sheehan appealed MetLife's notice of termination. Under the Plan, that appeal was decided by MetLife itself. A "Procedure Analyst" in MetLife's employ rejected Sheehan's appeal in a letter dated July 18, 2001, Pl.Ex. 5, at AR 0612–0616, thereby setting the stage for this action.

33. It is apparent that the case turns principally upon Sheehan's physical, which is to say cardiac, and psychiatric conditions (a) on March 31, 2001, when MetLife terminated his disability benefits and (b) at the present time. The evidence adduced at trial with respect to these two conditions will, in the first instance, be considered separately.

## D. Plaintiff's Cardiac Condition

34. In November 1994, while employed at Bear Stearns, Sheehan "experienced an acute myocardial infarction ('heart attack') due to a complete occlusion of the midportion of the left descending coronary artery. This was treated by angioplasty. One week later he underwent a myocardial perfusion stress test showing a 'large amount of scarring' and 'a small amount of exercise-induced ischemia in the territory of the LAD.'" I have quoted from page one of a letter opinion dated June 17, 2004

from Kenneth M. Stein, M.D., a cardiologist, to counsel for MetLife (the "Stein Letter"). Dr. Stein testified at trial for MetLife as an expert witness in cardiology. He based the opinions expressed in the Stein Letter and at trial on certain of Sheehan's medical records contained in the MetLife claim file. MetLife did not call as a trial witness Dr. Patel, the cardiologist upon whose opinion MetLife relied in terminating Sheehan's benefits. Thus for purposes of proof at trial, on the issue of Sheehan's cardiac condition MetLife's case depends principally upon the opinions of Dr. Stein.

35. "LAD," as used in the quotation from the Stein Letter in the previous paragraph, is an acronym for "left artery descending." "Ischemia" is "a condition in which the blood flow (and thus oxygen) is restricted to a part of the body. Cardiac ischemia is the name for lack of blood flow and oxygen to the heart muscle." "Ischemic heart disease" is "also called coronary artery disease and coronary heart disease. This can ultimately lead to heart attack." [8]

36. The evidence at trial demonstrated that MetLife's claim file did not contain all the medical records pertinent to Sheehan's cardiac condition since his heart attack in November 1995. For reasons that do not appear from the evidence, certain medical records and reports that Sheehan sent to MetLife were not placed in Sheehan's claim file. Specifically, the parties stipu-

---

7. There is a seeming lack of clarity in Met-Life's March 23, 2001 letter to Sheehan. The first paragraph from that letter quoted in text follows the phrase "continuation of benefits beyond the Secondary Benefit Period" with the parenthetical phrase "(24 months after the Waiting Period ends)." The parenthetical phrase could be read as defining the length of the *Secondary* Benefit Period, which would misread the Certificate; the 24–month (or two year) period after the Waiting Period ends constitutes the duration of the *Primary* Benefit

Period. But this subject need not be pursued further, since the validity of MetLife's reasons for terminating Sheehan's benefits lie at the heart of the case, and those reasons are clear enough.

8. The quotations in this paragraph are from the website of the American Heart Association, at http://www.americanheart.org, (last visited February 11, 2005). I may judicially notice these generally known clinical definitions pursuant to Rule 201(b), Fed.R.Evid.

lated at trial that medical records admitted into evidence as Pl. Exs. 12, 17, 18, 20, 21, 23 and 24 were not included in MetLife's claim file on Sheehan, although I find on the basis of Sheehan's testimony, Tr. 460, that Sheehan and his wife sent them to MetLife. In consequence, these particular medical records were not sent by MetLife to Dr. Stein. The most complete compilation of Sheehan's medical records is found in Pl.Ex. 36 for identification. That three-page document purports to summarize the contents of all of Sheehan's echocardiograms, angiograms, and thallium stress tests from November 25, 1994 (the day of his heart attack) to December 2, 2003, received in evidence at the trial.[9]

37. Sheehan has not worked at any job for any employer since his heart attack on November 15, 1994.

38. As previously noted, at the time of his heart attack Sheehan was under the care of Dr. Rony Shimony, a cardiologist. Following the attack Sheehan discharged Dr. Shimony, sued him for malpractice, and on the advice of friends consulted Steven Charno, M.D., a board certified cardiologist who maintains a practice on Long Island. Dr. Charno first saw Sheehan on September 3, 1996, and has treated him thereafter. Dr. Charno does not perform the more complicated diagnostic procedures such as stress tests, and performs no invasive procedures such as angiograms, also known as cardiac catheteriza-

tions. He refers a patient requiring such testing to other physicians in the area, who report their findings to Dr. Charno.

39. At the time of his heart attack Sheehan lived in Greenwich, Connecticut. On medical advice he moved to Florida in mid–1996. Sheehan, his second wife, and their two children, a four year old boy and a one year old girl, now live in Pompano Beach, Florida. But Dr. Charno continues to treat Sheehan. Sheehan comes to the New York area on a quarterly basis, and Dr. Charno evaluates his cardiac condition on each occasion, ordering further diagnostic tests from time to time. In addition, Sheehan consults with Dr. Charno by telephone from Florida if the need arises.

40. The summary of tests, Pl.Ex. 36 for identification, lists 26 diagnostic procedures performed on Sheehan. The earliest was performed at Lenox Hill Hospital, Manhattan on November 25, 1994, the date of Sheehan's heart attack. The most recent was performed at Long Island Jewish Hospital on December 2, 2003, on Dr. Charno's orders.

41. The Lenox Hill angiogram on November 25, 1994 revealed a 100% stenosis (that is to say, a blockage) of Sheehan's left anterior descending artery, which leads to the left ventricle of the heart.[10] That blockage had caused Sheehan's heart attack. It was treated by an angioplasty.

---

9. Pl.Ex. 36 for identification is the sort of summary frequently prepared by trial counsel to assist fact finders in understanding voluminous documents or other underlying evidence. Trial judges routinely instruct jurors that such summaries are not evidence and have no evidentiary value of their own. For that reason, such summaries are not received into evidence; they are simply marked for identification, as this one was. Jurors are further instructed that the evidence consists of the documents whose contents the summary purports to present, and if the summary does not accurately reflect the underlying evi-

dence, they are to disregard the summary and look to the evidence. In this bench trial, I gave the same instructions to myself. The Findings of Fact in this case are based upon the underlying medical records themselves, and not upon the summary.

10. I rely for the Findings in this paragraph upon the description of the Lenox Hill angiogram report appearing in the summary, Pl. Ex. 36 for identification, and upon the interpretation of that report by Dr. Stein, MetLife's expert witness in cardiology, at Tr. 189.

42. The medical records subsequent to this procedure reflect that over the years Sheehan has repeatedly complained of chest pain. The Stein Letter states at page 1 that Sheehan "experienced recurrent chest discomfort and, in January 1995, underwent a cardiac cathetarization," which, in Dr. Stein's view, "showed no significant residual coronary artery disease." However, in March 1997 and June 1998 Sheehan was hospitalized at the Cleveland Clinic Hospital in Fort Lauderdale, Florida, with chest pains. According to the hospital records, Pl.Ex. 19, on March 26, 1997 Sheehan was admitted to the Cleveland Clinic Hospital complaining of chest pain. The emergency physician record, after the printed caption "Similar symptoms previously," contains the handwritten notation "Yes pt has h/o angina once/month w/ similar quality." Sheehan was admitted again to the Cleveland Clinic Hospital on June 2, 1998, complaining of chest pain. A similar form, after the caption "Similar symptoms previously," contains the handwritten notation "Yes—one month ago." Dr. Alan Rosenbaum, a hospital staff physician, gave his written impression of Sheehan: "The patient has unstable angina. Will admit and rule out for myocardial infarction. Consider heart cathetarization." Pl Ex. 22. The Stein Letter referred to this hospitalization "due to recurrent chest discomfort," page 2, although its date was incorrectly said to be June of 1997 when it was June of 1998. The Stein Letter did not refer to the hospital physician's impression of "unstable angina." At trial Dr. Stein defined angina as "chest discomfort," and said that "[u]nstable angina, basically, just refers to a change in a previous pattern of angina." Tr. 209–210. "Unstable angina," Dr. Stein testified, is "a potentially significant finding. It's a worrisome phrasing [*sic* in the transcript] is the best way to phrase it." Tr. 210.

43. In June 2003 Sheehan was in the New York area and underwent a stress test which suggested the presence of ischemia. Sheehan returned to Florida with the recommendation that he undergo another cardiac catheterization. This procedure was performed at the Holy Cross Hospital in Fort Lauderdale on June 12, 2003 by Bart Musial, M.D., whose report is found at Pl Ex. 33. Sheehan presented himself at Holy Cross Hospital complaining of "weakness and fatigue." *Id.* at 1. The catheterization revealed that the right coronary artery had "a 40% narrowing in its mid portion before the second bend. In its distal portion just before the bifurcation there is critical 80% stenosis." *Id.* at 3. "Because of the stenosis of the right coronary artery it was decided to undergo angioplasty," *id.* at 1, which was performed that day. The Stein Letter at page 3 says of these events that "a significant obstruction of the right coronary artery (80%) was present and this was successfully treated with a stent."

44. The last medical records in evidence, Pl.Ex. 34 and Pl.Ex. 35, show that on December 1, 2003 Sheehan was back in the New York area. Dr. Charno referred Sheehan to Dr. Steven Kobren for a perfusion imaging exercise report. Sheehan exercised according to the Bruce Protocol, which involves walking in place on a treadmill through a series of "stages" with progressively increasing speed and elevation or grade (the latter creating the effect of walking up hill). After 11 minutes, Dr. Kobren reported that "[t]here was shortness of breath associated with exercise." Pl.Ex. 34. "The test was terminated secondary to fatigue and attainment of heart rate." *Id.* Sheehan was referred to the Long Island Jewish Hospital for an angiogram, which was performed on December 2, 2003. The conclusions based upon this procedure were: "nonobstructive coronary heart disease;" "moderately decreased left

ventricular ejection fraction (EF–43%)," "and no evidence of mitral regurgitation." Pl.Ex. 35. Dr. Rajiv Jauhar, who performed the procedure, stated that based upon its results, "it was recommended that the patient be managed with medical therapy." *Id.* Further Findings with respect to Sheehan's cardiac condition as reflected in the medical records will be found in ¶¶ 75–77, *infra.*

45. On direct examination, Sheehan described his present physical complaints:

Q. Mr. Sheehan, will you tell me what physical complaints you have now that you feel prevent you from working a full-time job?

A. I think my, my biggest problem is kind of continuous fatigue. I tend to be active an hour or two during the day, around the house, if I'm—I get chest pain and shortness of breath when I do too much. I know about that pretty quickly.

Q. How do you feel when you wake up in the morning?

A. It depends on how I slept.

Q. Okay. And if you slept well—

A. Yeah, I'm good, good for a while.

Q. Do you have energy?

A. Yeah, sometimes.

Q. Okay.

A. I try to go out early, while I still have energy.

Q. Do you run out of gas after a while?

A. Yeah, midday, I try to take a nap every day.

Q. The chest pains, how often do you get them?

A. They're random, they just come. If I overdo it, you can predict that, and sometimes, you know, sometimes you'll just bend over, and your vision will go through a pinhead.

Q. How do you feel about chest pains?

A. I'm afraid of them.

Q. Why?

A. I spent six hours in Lenox Hill Hospital on a gurney trying to convince somebody that I was having a heart attack, and I almost died there. And when you do that once, every chest pain goes back to the same place.

Tr. 468–469.

46. Dr. Charno, Sheehan's treating cardiologist in Long Island, testified at the trial as a witness for Sheehan. On direct examination he described his treatment of Sheehan, and was asked by counsel if he has "an opinion as his treating physician whether or not he could work on a full-time basis at any job," to which Dr. Charno responded: "My opinion is that he cannot." Tr. 287. At the end of Dr. Charno's testimony, after counsel for both parties had concluded their questioning, I put these questions to him:

THE COURT: You said to counsel, I think, that in your opinion Mr. Sheehan, in his present condition, was, according to my note, at least, disabled from all work. Is that the opinion you presently hold, Doctor?

THE WITNESS: From all work that he could reasonably be expected to do.

THE COURT: All right. Give me, sum up for me your reasons for holding that opinion.

THE WITNESS: He gets extremely fatigued extremely quickly. He gets short of breath with minimal or very little exertion. He does get chest pain. He's on medications for all the aspects of cardiac disease. He's on four or five different medications, and he just has no staying power at all and he gets, because he's had several unstable episodes, including one last year when he just collapsed and was hospitalized for that. That would have been his sixth angiogram, but he refused it. He collapsed. Admitted for a vascular collapse in Florida.

These are the reasons that I'm basing it on. Tr. 327–328.

47. Earlier in his testimony, Dr. Charno touched upon another significant aspect of the case, and I will quote that testimony as an overture to the testimony of another of Sheehan's treating physicians, Dr. Renato Prati, a psychiatrist. Dr. Charno testified on direct examination:

Q. Have you ever heard the term "cardiac neurosis"?

A. Yes.

Q. What caused, in your opinion, what was it that caused Mr. Sheehan's initial disability back in 1994 and '95?

A. That's when he had his heart attack.

Q. Okay. Does he also suffer from any type of mental condition?

[Opposing counsel objects to question and is overruled.]

A. He has cardiac neurosis, subsequent to the initial cardiac event.

Q. What is comorbidity, doctor?

A. Comorbidity is a confluence of factors contributing to sickness.

Q. Does Mr. Sheehan have comorbidity?

A. Yes, I believe.

Q. What is it?

A. Coronary artery disease symptoms attendant to his heart problem and his cardiac neurotic condition as well.

Tr. 290. I will consider the evidence concerning Sheehan's cardiac neurosis and the resulting comorbidity effect in the next sub-part of these Findings.

## E. Plaintiff's Psychiatric Condition

48. Dr. Renato Prati, a board certified psychiatrist practicing on Staten Island, first saw Sheehan on April 6, 1995. He saw him regularly thereafter until Sheehan moved to Florida in 1996. Now Dr. Prati sees Sheehan during Sheehan's quarterly trips to New York. He also conducts 50–minute telephone conversations with Sheehan in Florida every two weeks.

49. On a prior motion in the case Dr. Prati submitted a medical affirmation, ¶ 4 of which he adopted as part of his testimony at trial. It says:

Mr. Sheehan's subjective symptoms which were obtained during psychotherapy visits are depression, fear of death, anxiety, fatigue, constriction of interest, inability to manage stress, decreased concentration and memory ability, poor sleep pattern, loss of appetite, and variable psychomotor impairment. In addition, Mr. Sheehan suffers from recurrent chest pains.

Tr. 70–71. On direct examination counsel for Sheehan asked Dr. Prati "is there an underlying cause of these mental conditions"? This testimony then ensued:

A. I believe the underlying cause is that he has cardiac pathology and that he, his response to the pathology is what we would call cardiac, cardiac neurosis . . . .

Q. What is cardiac neurosis?

A. It's a conglomeration of everything we just read, which is basically focused on the cause as being a cardiac pathology, a heart illness and then the neurosis exacerbates the heart illness. Now we have stress exacerbating a cardiac condition. My area is the stress area. All right. Once you have more distress, I think your cardiac condition gets worse. So it's a very vicious cycle.

Tr. 74–75. "Cardiac neurosis" is a condition recognized and given an identifying number on the well-known Psychiatric Diagnostic and Statistical Manual of Mental Disorders, or "DSM." Tr. 76.

50. Cardiac neurosis when combined with cardiac pathology brings about that condition of comorbidity described by Dr. Charno in his testimony. Dr. Prati de-

fined comorbidity in comparable terms: "Basically, there are two illnesses existing at the same time. One is cardiac pathology and the other is cardiac neurosis." Tr. 75. Sheehan's psychiatric condition adversely impacts upon his cardiac condition "[b]ecause stress will affect the functioning of the heart"; it is a recognized risk factor in heart attacks. Tr. 75–76.

51. Dr. Prati described what occurs and what he attempts to accomplish during his psychotherapy sessions with Sheehan, in person or on the telephone:

A. And we basically discuss all areas that I consider that we could have, make an attempt to decrease the stress, make an attempt to give him alternatives, support him in different areas so that—my whole function is basically to decrease the stress, decrease the anxiety, get him as close as I can to the feeling that *he could live for one day to the next instead of waiting to die.* The all-pervasive thing, all right, that occurs with these types of things is *a patient thinks they're going to die.* And therefore, you know, why make plans, why, why do this, why do that?

Tr. 76–77 (emphasis added).

52. In Dr. Prati's opinion, Sheehan is presently "unfit for any type of employment." Tr. 84.

53. Dr. Prati expressed a further opinion on direct examination, as follows:

Q. Is Mr. Sheehan's disability in your opinion the result of a mental or nervous condition?

A. No.

Q. What causes Mr. Sheehan's disability, Doctor? We'll get into exactly what the disability is later.

A. His cardiac pathology. He has heart disease.

[Objection overruled.]

Q. Okay. Now, Doctor, if his disability is a result—is not the result of a mental or nervous condition, does he suffer from a mental or nervous condition?

A. Yes.

Q. What causes, in your opinion, his mental or nervous condition?

A. The fact that he has cardiac pathology, that he has a damaged heart, which causes stress.

Tr. 72–73. This testimony is a precursor to Dr. Prati's later statement, quoted in ¶ 49, that Sheehan's cardiac neurosis constitutes his *"response"* to his cardiac pathology (emphasis added). Hence the use of the adjective "cardiac" to modify the noun "neurosis." This is important testimony because, as will be further developed in the these Findings and in the Conclusions of Law in Part III, it speaks not only to whether Sheehan is disabled from work, but also to whether such disability, if proven, is covered by the MetLife Plan.

54. Counsel for MetLife cross-examined Dr. Prati on this point:

Q. Let's talk about cardiac neurosis. He has to have objective findings of a cardiac problem to have cardiac neurosis, isn't that correct?

A. Yep.[11]

Q. If he doesn't have a real cardiac problem, but he has fear, that's a different diagnosis, correct?

A. Correct.

Q. What's that diagnosis?

A. Hypochondria.

Q. So you're saying that he's not a hypochondriac, but that he does have cardiac neurosis?

---

**11.** The court reporter who covered the trial had a keen ear. The transcript is replete with witnesses' affirmative responses in the form of "yep" and "yeah."

A. That's correct, because the cardiac neurosis is based upon, all right, cardiac damage. He has heart problems.

Tr. 125–126.

55. Dr. Prati testified that over the years his therapy had improved Sheehan's mental condition to some degree. On that subject, he testified on direct examination:

A. Well, it took quite a few years between me and his wife to convince him that could be around long enough to have two more children, and that's kind of devastating, you know. You have a child and you say I don't even think I'm going to see this child five years old. Thank God he's got two healthy, a boy and a girl.

Q. All right.

A. And that is what I call an overall improvement. Does it mean that he doesn't think about, you know, I better enjoy my kid now because I could die tomorrow because this heart doesn't get any better? And that's still there, you know.

Q. Now, Doctor, has this improvement in any way improved to the point where he's able to go back to work on a full-time basis?

A. No. We're talking about minimal, minimal stress in the home environment.

Tr. 93–94.

### F. The Testimony of Dr. Stein

56. Dr. Stein was the only medical expert witness MetLife called at the trial. MetLife identified Dr. Stein as an expert witness in cardiology, and the Court qualified him as an expert in that specialty.

Notwithstanding that limitation, Dr. Stein's testimony is relevant to both Sheehan's cardiac condition and his psychiatric condition.

57. Dr. Stein, the author of the opinion letter sent to MetLife's counsel and described in ¶ 34, was listed in the pre-trial papers as an expert witness for MetLife. However, counsel for Sheehan called Dr. Stein as an adverse witness, with counsel for MetLife then being in the position of eliciting any further evidence from him by what was in form (although not in substance) cross-examination.

58. Counsel for Sheehan took Dr. Stein through the Stein Letter, sentence by sentence. While Dr. Stein acknowledged that he had not received or considered some medical records upon which counsel laid a certain emphasis, he did not retreat in any material way from the opinions he expressed in the Stein Letter. Rather than quote at length from Dr. Stein's trial testimony, I will set quote the opinions with which the Stein Letter concludes, to which Dr. Stein adhered in his testimony. Dr. Stein reviewed the medical records furnished to him by MetLife. His Letter focused particularly upon Sheehan's ventricular function (measured by the ejection fraction, *see* fn. 12, *infra*) as revealed by echocardiograms, and upon the results of Sheehan's several stress tests. The five concluding substantive paragraphs in the Stein Letter, at pages 3–4, read as follows:

In June 2003 another echocardiogram showed mild impairment of ventricular function (ejection fraction: 43%).[12] During a perfusion stress test he exercised

---

**12.** The Stein Letter at page 1, fn. 1 states:

Ejection fraction refers to the amount of blood pumped out with each heartbeat as a percentage of the total amount of blood within the heart. No heart empties completely with each beat. A normal ejection fraction is greater than 55%. Ejection fractions between 40% and 55% represent mild impairment of ventricular function and are not associated with an adverse prognosis. Ejection fractions below 40% are moderately impaired and those below 30% are severely impaired. These values are associated with increased risk of death due to arrhythmias and progressive heart failure.

to Stage 3 of a Bruce protocol with evidence of a small area of ischemia.[13] He underwent another cardiac catheterization. This time a significant obstruction of the right coronary artery (80%) was present and this was successfully treated with a stent. A ventriculogram during the cardiac cath showed normal ventricular function (ejection fraction: 60%). In December 2003 he had another perfusion stress test. He exercised for 11 minutes of a Bruce protocol before the test was terminated due to fatigue. There was only evidence of a small area of ischemia. Ventricular function was normal with stress (ejection fraction: 60%). Another cardiac catheterization was performed, showing no significant residual coronary artery disease. Ventricular function was mildly impaired (ejection fraction: 43%). He saw Dr. Kobren who noted that "he denies any chest pain, shortness of breath" and who felt that he was "clinically stable." [14]

The evidence thus clearly demonstrates that Mr. Sheehan is physically capable of resuming his work. At present he has no significant residual obstructions in his coronary arteries. Multiple imaging studies over the years have shown him to have at worst mild impairment of his ventricular function. The most recent assessment shows him to have perfectly normal ventricular function.

In addition, during multiple stress tests, Mr. Sheehan has demonstrated excellent effort tolerance. He has consistently been able to exercise to stage 3 or stage 4 of a Bruce protocol with mild-to-no symptoms. It is worth looking in some detail at what this entails. On his last test, he exercised on a treadmill for 11 minutes. At the end of this test he was walking at *4.2 MPH* up a *16% incline* at which point he began to develop fatigue and shortness of breath. This represents a work capacity of 12.8 METs. One "MET" (metabolic equivalent) is the amount of oxygen consumed at rest. Hard physical labor like farming or construction work is estimated to require 4–9 METs. 13 METs represents the effort expended when playing sports.[15]

Mr. Sheehan's consistent ability to exercise to a high level during stress tests without any significant adverse finding shows a function capacity that is certainly far in excess of the physical demands of his prior employment. The stress test results speak for themselves. They are consistent with his ability to exercise and jog and with his physical activities demonstrated on the video surveillance tapes. The results are entirely inconsistent with Dr. Charno's assertion on the

13. The Stein Letter at page 2, fn. 2 states:
   The Bruce protocol is a standard protocol for performing treadmill based exercises. The patient walks on the treadmill (running or jogging is prohibited, since it is easier at higher speeds) through a series of "Stages" with progressively increasing treadmill speed and elevation. The test is terminated when a heart rate target is reached or when the patient develops symptoms of fatigue, chest pain, or shortness of breath.
   In Stein's letter, the five numbered stages of the Bruce protocol are then set forth. Stage 3 involves a treadmill speed of 3.4 mph, an inclined grade of 14%, and a time of 3 minutes. Grade 4 involves a speed of 4.2 mph, a grade of 16%, and a time of three minutes.

14. In this sentence Dr. Stein is quoting from a report dated December 1, 2003 by Dr. Steven M. Kobren, received as part of Pl.Ex. 8. I have omitted the last sentence of this paragraph from the Stein Letter because it became clear at the trial that it referred to a different individual, whose medical report MetLife had been mistakenly included in Sheehan's claim file.

15. Dr. Stein is referring to the tests conducted in December 2003 and described in ¶ 44, *infra*.

"Physical Capacities Evaluation" of June 2000 stating that Mr. Sheehan can "never" lift or carry up to 10 pounds, can not sit for more than 1 hour of a working day and cannot stand or walk for any period during a working day.

In sum, Mr. Sheehan has had a prior heart attack but has at worst mild impairment of his ventricular function and has an excellent effort capacity. In my experience, patients in this condition are characteristically able to return to full-time employment. In fact, I have treated numerous patients with similar histories who have returned to work. Mr. Sheehan is clearly capable of working full-time without physical limitation.

(emphasis in original).

59. These opinions of Dr. Stein relate solely to Sheehan's physical condition. He said nothing about the possible mental effect of a heart attack upon the individual suffering it. But toward the end of his testimony, Dr. Stein ventured into that territory. Interestingly, he did so in responding to questions by counsel for Met-Life. Counsel was pursuing a line of inquiry based upon the fact that many of Sheehan's professed symptoms were subjective, rather than clinically demonstrated by objective tests. Dr. Stein then gave this testimony:

Q. And if a patient presented to you with the same subjective complaints or with similar subjective complaints, as Mr. Sheehan has made in the histories, what would you do?

A. Well, you know, I think a couple of things. I think first off, you have to discuss with him exactly what sort of heart disease he has. And I think he's someone who you really need a lot of, for want of a better term, hand holding and discussion and reassurance, that the stress tests really show that he's not placing himself at any risk if he exerts himself. And that therefore, he ought to be encouraged to go out and do a structured exercise program, to go out and work, if he wants to work. To get out of the house, to be active. Because physical activity is just extremely important for people in general and for cardiac patients.

I think, second, my impression within the chart is that he has a lot of anxiety related to what might happen to him if he does start doing this. *And at least in my practice, we do work with cardiac psychologists, and, you know, hypothetically, in patients similar to him, I would refer over to the psychologist as well.*

Tr. 270 (emphasis added). Counsel then asked what a physician should do when a patient's subjective complaints do not correlate with the objective tests. During the course of his answer, Dr. Stein said this:

I think once you convince yourself that the mistake isn't in the objective tests, once you convince yourself that there is some internal validity to what you're seeing time and again with different modalities as well as repeating the same modality, then at some point you say to the patient, look, there really is no physical basis for some of these problems.

And, you know, that's the art of medicine. That's part of, you know, the difference between being a technician and being a doctor. That's then when it comes to knowing the patient and knowing how to speak with them. If there's a family, speaking with the family members, and you can offer reassurance *and you can offer referral to a psychologist.*

Tr. 271–272 (emphasis added). Counsel for Sheehan followed up on this testimony.

Q. Now, you also said that if you had a patient like Mr. Sheehan, you would refer him to a psychologist, is that correct?

A. I said to a cardiac psychologist.

Q. Cardiac psychologist. And would you then consider—are you familiar with the term "cardiac neurosis"?

A. Yes.

Q. Is that something that, is that a condition that's well documented in medical literature?

A. I don't know about well documented. It's a term of art. It's a standard term.

Q. Have you ever seen—all right. Withdrawn. It's a standard term that's used in the profession and the fields of cardiology and psychiatry, right?

A. Yes.

Q. You did not evaluate whether or not Mr. Sheehan suffers from a condition of cardiac neurosis, did you?

A. No, I did not.

Tr. 275.

### G. The Opinion of Dr. Givens

60. In its March 23, 2001 letter to Sheehan terminating his benefits, MetLife stated (somewhat ungrammatically) that "[t]he review of medical records and surveillance tapes conclude that there is no objective medical evidence from a psychiatric perspective that would preclude you from return to work." Pl.Ex. 5 at page AR 0561. MetLife based that conclusion upon a written opinion by Reginald A. Givens, M.D., board certified in psychiatry and neurology, dated September 18, 2000. Pl.Ex. 5 at pages AR 0688–0690. Dr. Givens began his report by stating: "From a psychiatric perspective, according to the medical records, the primary diagnosis affecting Mr. Sheehan's ability to work is that of depression and anxiety." AR 0688. Dr. Givens had considered a report by Dr. Prati dated August 17, 2000, and disagreed with his conclusion of disability. Dr. Givens wrote: "Dr. Prati did not provide objective evidence concerning mental status examination findings that would support a cognitive dysfunction. The history does support the diagnosis of Mr. Sheehan's treating physician [Dr. Prati] regarding depression and anxiety. According to the medical records, objectively speaking, from a psychiatric perspective, Mr. Sheehan does not have an impairment." AR 0688–0689. Dr. Givens then checked some boxes on a printed "Mental Residual Functional Capacity Assessment," AR 0695–0696, in a manner consistent with his conclusion that Sheehan was not psychiatrically disabled from working.

61. Dr. Givens did not examine Sheehan, nor, apparently, did MetLife suggest that he do so. This is significant in the light of Dr. Givens's expressed views of how a meaningful psychiatric disability evaluation should be conducted. He wrote in his report to MetLife:

In order to support psychiatric disability, *the evaluator must complete and document a full psychiatric evaluation.* Symptoms *and observations* must be carefully compared to specifics of job function requirements. The assumption that pathology equals disability must be avoided, and assessments of mental impairment should avoid purely subjective statements. Assessment of permanent impairment should not be made until maximum improvement has been achieved.

In addition to documenting clinical *observations,* diagnosis and treatment, the American Medical Association's *Guides to the Evaluation of Permanent Impairment* should be utilized. These closely follow the Social Security Administration's Guidelines for assessing disability. They require evaluation of a person's performance of activities in the following categories: 1) tasks of daily living, 2) social functioning, 3) concentration/persistence/pace, and 4) adaptation to work-like settings. Information should be obtained from various sources to insure validity, and the deficits must then be

related to occupational requirements. The measure of disability is best served by accurate and thorough work appraisal.

AR 0689–0690 (emphasis added) (footnotes to medial references omitted). While Dr. Givens made these comments in criticism of Dr. Prati's report, no difference is discernible between the requirements for a meaningful psychiatric disability evaluation that an individual is psychiatrically disabled (Dr. Prati's opinion about Sheehan) and an evaluation that he is not (Dr. Givens's opinion about Sheehan).

62. At the end of Dr. Prati's trial testimony, I read to him the paragraph in Dr. Givens's report I have just quoted, and called Dr. Prati's attention to the boxes Dr. Givens had checked on the MetLife assessment form. This testimony ensued:

THE COURT: Here is the impression that I derived from that paragraph. I read Dr. Givens to be saying that in order to support psychiatric disability, a psychiatrist has to see a lot more of a patient than Dr. Givens himself was able to attest to. Is that a fair interpretation, do you think?

THE WITNESS: Yes, yes.

THE COURT: I read this paragraph as a description by Dr. Givens of what a psychiatrist must do in relation to a particular patient to form an opinion as to whether or not that patient suffers from a psychiatric disability. Do you agree with what I've just said in substance?

THE WITNESS: Absolutely, yes.

\*    \*    \*    \*    \*    \*

THE COURT: In view of what Dr. Givens' report says, with particular reference to the paragraph I read and your reactions to my understanding of that paragraph, do you have an opinion as to whether or not Dr. Givens was in a position accurately to fill out this particular form in the manner that he did, checking off the boxes?

THE WITNESS: I don't believe he was in a position to accurately fill out that form.

THE COURT: And why is that?

THE WITNESS: Because a lot of this depends on interviewing the patient and spending time with the patient. He's got a whole host of boxes and questions. You can't just—without seeing a person, I don't know how he could make, make some of these judgmental—I can't.

Tr. 144–145. I find that testimony to be persuasive. It diminishes the probative value of Dr. Givens's opinions.

## H. Findings on Ultimate Issues

### 1. *Rules Governing Findings of Fact by District Courts in ERISA cases*

63. Before stating my findings on the ultimate issues of fact, it is useful to review the rules of law applicable to the nature and scope of a district court's factual inquiry in ERISA cases.

64. Where, as in the case at bar, "an ERISA plan does not accord an administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo*." *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 (2d Cir.2004) (citation and internal quotation marks omitted). Upon *de novo* review, "a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence," and "is free to evaluate a treating physician's opinion in the context of any factors it considers relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Id.* at

296–97 (citation, internal quotation marks and brackets omitted). *A fortiori*, a district judge's freedom of evaluation extends to the opinions of non-treating physicians who have not examined a plaintiff and base their opinions solely upon the documents in an insurance company's claim file. I apply these principles to the Findings of Fact in this case.

65. The related question is whether a district court's *de novo* review of factual issues in an ERISA case is limited to a review of the administrative record or whether the court may consider evidence outside that record. It is generally held that while a district court has discretion to admit evidence outside the administrative record, there must be "good cause" for doing so. *See Sheehan II*, 2003 WL 22290230, at *3. The Second Circuit addressed that question of "good cause" in *Locher*. Prior to the *Locher* decision in November 2004, a number of district courts in this circuit had interpreted the Second Circuit's opinion in *DeFelice v. Am. Int'l Life Assurance Co. of New York*, 112 F.3d 61 (2d Cir.1997), "as holding that an administrator's dual status as claims reviewer and claims payor is *per se* 'good cause' for allowing additional evidence upon a *de novo* review of factual issues." *Locher*, 389 F.3d at 294 (citing cases). "Other district courts found no *per se* rule and held that 'good cause' is established under *DeFelice* only if the plaintiff can demonstrate that the administrator was conflicted and that the additional evidence should have been included in the administrative record but was not, because of no fault of the claimant." *Id.* (citations and internal quotation marks omitted). In *Locher* the Second Circuit undertook to resolve that uncertainty:

We take this opportunity to clarify our holding in *DeFelice* and make plain that a conflict of interest does not *per se* constitute "good cause" to consider evidence outside of the administrative record upon a *de novo* review of factual issues bearing on an administrator's denial of ERISA benefits.... We hold that a conflicted administrator does not *per se* constitute good cause, and caution district courts that a finding of a conflicted administrator alone should not be translated *necessarily* into a finding of good cause. In the case at hand, we hold that the District Court's finding of good cause is bolstered in part by the finding that there were insufficient procedures for internal or appellate review. In so finding, we do not conclude that a finding of a conflicted administrator, standing alone, can never constitute good cause. We need not address that possibility here, as it is not presented to us, but we note that it may be possible, in unforeseen circumstances, for good cause to rest entirely on the existence of a conflicted administrator.

389 F.3d at 294, 296 (emphasis in original). With those aids to navigation, district judges in this circuit must chart their course in ERISA cases as best they can.

### 2. *The De Novo Review Conducted by This Court in This Case*

66. In *Sheehan I* I held that Sheehan would be "entitled to present evidence outside the administrator's record on issues of plan interpretation, and, if plaintiff is able to demonstrate a conflict of interest or other good cause, plaintiff will also be entitled to present evidence outside the record on the issue of his physical condition." 2002 WL 1424592, at *2.[16] In *Sheehan II* I

---

**16.** The first of these two holdings, dealing with plan interpretation, reflected the Second Circuit rule that "a district court may consider evidence outside the administrative record upon a *de novo* review of issues of plan inter- pretation." *Locher*, 389 F.3d at 293 (citing *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 103–05 (2d Cir. 1991)). *Locher*, which was concerned solely

concluded that "[b]ecause Sheehan has shown good cause, the Court will admit the additional evidence." 2003 WL 22290230, at *4. There were two bases for that conclusion. First, I cited *DeFelice* for the proposition that "[b]ecause of [MetLife's] potential for partiality, the Court has 'good cause' to admit Sheehan's proposed additional evidence." *Id.*, at *3. That *per se* reading of *DeFelice* does not survive the Second Circuit's later decision in *Locher*. But I also stated a second basis for good cause: the demonstrated incompleteness of the administrative record upon which MetLife based its termination of Sheehan's benefits. The record at that time revealed that Sheehan's treating physicians, Drs. Charno and Prati, whose input had been limited to written statements and forms submitted to MetLife, "were not afforded an opportunity to view the video surveillance tapes prior to MetLife terminating Sheehan's benefits," and "several medical documents relevant to Sheehan's claim for total disability are missing from the administrative record." *Id.*, at *3–*4. These circumstances seemed to me sufficient to establish good cause for going beyond that record, so that the treating physicians could testify and any missing medical records be received into evidence. Drs. Charno and Prati did indeed testify at the trial, and Plaintiff's Exhibits 12, 17, 18, 20, 21, 23 and 24 were received, these being clinical test results and physicians' impressions of Sheehan's cardiac condition generated between January 6, 1995 (Ex. 12) and November 29, 1999 (Ex. 24) which counsel for MetLife stipulated were not in the claim file, Tr. 354–55, and hence not considered in MetLife's review of the case.[17] While the parties do not presently attach

any decisive significance to these particular medical records, that is not relevant to the Court's decision to consider evidence outside the administrative record: the fact that pertinent medical records were missing from the claim file, together with the inability of Sheehan's treating physicians to view and comment upon the surveillance videotapes of their patient, furnished good cause for the exercise of my discretion.

67. There is an additional reason for the Court's considering evidence beyond the administrative record, discernible when I decided *Sheehan II* although not mentioned in the opinion. In ¶¶ 60–62, *supra*, I described the report of Dr. Givens, the psychiatrist whose opinion that Sheehan was not psychiatrically disabled MetLife relied upon in terminating Sheehan's benefits. In arriving at his opinion, Dr. Givens depended entirely upon the documents in MetLife's claim file. While the file contained a written report by Dr. Prati, Sheehan's treating psychiatrist, Dr. Givens did not examine or interview Sheehan himself. That omission is relevant to the issue of whether "sufficient procedures for initial or appellate review of a claim are lacking," *Locher*, 389 F.3d at 296, particularly with respect to MetLife's psychiatric evaluation of Sheehan.

68. Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time. *See, e.g., People v. Espinoza*, 95 Cal. App.4th 1287, 116 Cal.Rptr.2d 700, 718–19 (2002) (in a prosecution for molestation of a child, "L," where defendant "proposed to introduce testimony by a psychiatrist *who*

with *de novo* reviews of factual issues, did not abrogate that rule.

17. Sheehan testified that with the assistance of his wife, trained as an attorney, he mailed to MetLife copies of all his medical reports

and forms. Tr. 457–460. I accept that testimony as plausible, but Sheehan did not offer at trial copies from his files of any medical records in addition to those referred to in text that had not found their way into the MetLife claim file.

had never examined L. that L. did not suffer from any mental illnesses diagnosed by any of the psychiatrists *who actually examined her,*" appellate court affirmed trial court's ruling that "the proffered evidence was speculative and therefore had little probative value") (emphasis added); *Campbell v. United States,* 307 F.2d 597, 598 (D.C.Cir.1962) ("Appellant says, and we agree, that the testimony of the psychiatrist relied upon by the Government was of little probative value. The psychiatrist had no information about the defendant's mental condition, testified largely in terms of a legal conclusion, and *had never seen defendant prior to the trial."*) (emphasis added); *Rollerson v. United States,* 343 F.2d 269, 270 (D.C.Cir.1964) ("[W]e think it necessary to point out that the value of a psychiatrist's testimony depends largely upon *his opportunities for observation* and *the facts he observes."*) (emphasis added); *Jones v. United States,* 327 F.2d 867, 879–80 (D.C.Cir.1963) ("Here the psychiatric evaluation apparently took but a few seconds and was limited to observing the patient during that time through prison bars"; report of psychiatric panel that defendant was mentally competent based upon so limited an observation "would not, in any event, be a predicate for any such adjudication") (concurring opinion).

69. Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms: in Sheehan's case, as described by Dr. Prati, de-

pression, fear of death, and anxiety, among others. Physicians do not diagnose or evaluate these different conditions in the same way. It matters not if a patient with ischemia, ventricular scarring, or atrial fibrillation is depressed or elated; an echocardiogram or stress test will reveal his condition. It matters not if a patient with arthritic spinal degeneration or scoliosis fears death or believes himself immortal; an x-ray or MRI will reveal his condition. But surely Dr. Prati was right in testifying that when a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," Tr. 145, a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes. That medical reality explains the holdings of the cases I have cited.

70. In the case at bar, the procedure MetLife employed in determining Sheehan's psychiatric condition was limited to obtaining an opinion from a psychiatrist who never examined him. Given the foregoing considerations, I conclude that MetLife's procedure was sufficiently flawed to give the Court good cause to consider evidence outside the administrative record.[18]

71. *Locher* makes it clear that this Court's *per se* reading of *DeFelice* in *Sheehan II* does not preclude a good cause determination based on other factors. "Despite the District Court's statement that we had set forth a *per se* rule in *DeFelice,*" the Second Circuit said in *Locher,* "the District Court did consider facts other than the structural conflict in arriv-

---

**18.** I do not undertake in this opinion to suggest a *per se* rule that a long term disability insurer can never conclude that a beneficiary is not psychiatrically disabled unless the insurer's psychiatric expert has examined the beneficiary. There may be an unusual case where, contrary to all the conventional wisdom including that expressed by Dr. Givens, a consulting psychiatrist can arrive at a sound opinion without ever examining, seeing or interviewing the individual in question. But a psychiatric evaluation of a cardiac neurosis of the sort the evidence shows afflicted Sheehan is not one of those unusual cases.

ing at its good cause consideration," properly assumed "an active role in order to ensure a comprehensive and impartial review of the case," and made a good cause determination that "is bolstered in part by the finding that there were insufficient procedures for internal or appellate review." 389 F.3d at 296. In the case at bar this Court's good cause determination and consideration of evidence outside the administrative record are based upon comparable factors.

### 3. Findings

72. (A). To succeed on his claim against MetLife for past disability benefits, Sheehan had to prove by a preponderance of the evidence that on March 31, 2001, the date MetLife terminated his benefits, he was "Totally Disabled" as that term is used in ¶ 9, 1.B of the Certificate, which requires a showing that "(1) You can not do your job; and (2) You can not do any other job for which you are fit by your education, your training, or your experience." (B). To succeed on his claim for future disability benefits, Sheehan had to prove by a preponderance of the evidence that this condition of total disability exists at the present time and will continue to do so. (C). Finally, Sheehan had to show that the disability from which he suffered and suffers is covered by the Plan articulated in the Certificate. The Findings of Fact in this subpart address the first two of these three issues. The third issue of coverage, which presents mixed questions of fact and law, is addressed in Part III, which sets forth the Court's Conclusions of Law and certain additional Findings.

73. On March 31, 2001, and at the present time, Sheehan was and is suffering from that condition known as "comorbidity," which is a confluence of two illnesses existing at the same time. In Sheehan's case, the comorbid illnesses were and are coronary heart disease, a physical illness, and cardiac neurosis, a psychiatric illness.

The presence and effect of comorbidity in Sheehan's case are described in Dr. Charno's testimony, quoted in ¶ 46, and in Dr. Prati's testimony, quoted in ¶ 50. I accept that testimony. MetLife offered no contrary medical evidence. Dr. Stein was concerned only with Sheehan's cardiac condition. Dr. Givens was concerned only with his psychiatric condition. Neither physician dealt specifically with comorbidity.

74. The presence of Sheehan's two comorbid illnesses are demonstrated by the evidence. I will deal first with Sheehan's cardiac condition and then his psychiatric condition.

75. On March 31, 2001, Sheehan suffered from coronary artery disease. That condition was manifested by recurring intermittent pain and shortness of breath. To be sure, these symptoms are subjective, but the evidence militates against a finding that Sheehan was making them up or exaggerating them to mislead MetLife and prolong his totally disabled status. In March 1997 and again in June 1998, Sheehan went to the emergency room of the Cleveland Clinic Hospital in Fort Lauderdale, complaining of chest pains which, according to the hospital records, he said occurred about once a month. At the times of those hospital visits MetLife was paying disability benefits to Sheehan, who had no reason to suppose that the payments would be terminated. I find that Sheehan went to the hospital on these two occasions complaining of chest pains because he was having chest pains. During the June 1998 hospitalization a Cleveland Clinic doctor made a diagnosis of "unstable angina," which Dr. Stein acknowledged was a "potentially significant finding" and "worrisome." Moreover, in June 2003 a catheterization performed at Holy Cross Hospital in Fort Lauderdale revealed an 80% stenosis in Sheehan's right coronary

artery which was treated with a stent. The Stein Letter describes this obstruction as "significant"; Dr. Musial, the treating cardiologist at Holy Cross, described it as "critical." Pl.Ex. 33. It is reasonable to infer that this obstruction resulted from the worsening effect of coronary artery disease which existed on March 31, 2001.

76. To a lesser degree, Sheehan suffers from coronary artery disease today. The most recent medical reports by treating or examining physicians are Dr. Kobren's two reports dated December 1, 2003, Pl.Ex. 8 and Pl.Ex. 34, and Dr. Jauhar's December 2, 2003 report to Dr. Kobren about the results of Sheehan's angiography and cathetarization on December 1, Pl.Ex. 35. Dr. Kobren's perfusion imaging exercise report, Pl.Ex. 34, recites that Sheehan was referred to him by Dr. Charno and that the "indications for procedure" were: "Rule out myocardial ischemia, chest pain; hypertension; high cholesterol; shortness of breath; stent; syncope; f/n of CAD; angina; smoking." It would appear from Dr. Kobren's other report dated December 1, 2003, Pl.Ex. 8, that before performing the stress test, Dr. Kobren conducted a physical examination of Sheehan. His report states: "The patient denies any chest pain, shortness of breath, syncope or abdominal pain. He is here for a coronary artery disease follow up." This report describes Sheehan as "[w]ell developed, well nourished, and in no acute distress." Dr. Kobren's impression based upon this physical examination is: "Status post coronary artery disease—status post stent, clinically stable." Dr. Kobren then subjected Sheehan to the stress test. His report of that test, Pl.Ex. 34, recites the results as "small area of ant/septal attenuation in stress images" and "stress gated EF of 60%," and his impression as "small area of ant/septal attenuation in stress images only." Dr. Kobren then sent Sheehan to the Long Island Jewish Medical Center for a catheterization.[19] Dr. Jauhar performed that procedure on December 1 and reported his findings to Dr. Kobren in his report dated December 2, 2003, Pl. Ex. 35: "The findings of this study were as follows: Nonobstructive coronary artery disease; Moderately decreased ventricular ejection fraction (EF–43%); No evidence of mitral regurgitation." Dr. Jauhar concludes: "Based upon the results of this procedure, it was recommended that the patient be managed with medical therapy." It is on these most recent medical records that Dr. Stein based his final opinion: "In sum, Mr. Sheehan has had a prior heart attack but has at worst mild impairment of his ventricular function and has an excellent effort capacity." *See* ¶ 58, *supra.*

77. Sheehan testified that he presently suffers from chest pains and shortness of breath, and Dr. Charno testified that Sheehan presently complains to him about those symptoms. I accept that testimony, but the degree of severity of Sheehan's present cardiac condition is lessened by the most recent objective medical evidence, as well as by Sheehan's denial of chest pain or shortness of breath to Dr. Kobren on December 1, 2003. While I

---

**19.** During his trial testimony, Dr. Stein expressed apparent surprise that Dr. Kobren referred Sheehan for a cathetarization, given the favorable results of the stress test. Dr. Stein testified: "You know, in December, 2003, he has a stress test. He does very well on the stress test in terms of his functional capacity, which really is probably the most important determinative of his prognosis and his ability to work. That test shows evidence of a small area of ischemia. They again get an ejection fraction of 60 percent but refer him, *for whatever reason,* for another cardiac catheterization. That certainly is not an emergent cardio catheterization. I wouldn't even characterize that as urgent." Tr. 225 (emphasis added).

find that Sheehan continues to suffer from coronary artery disease to some degree—I do not understand even Dr. Stein to question that—the disabling effect of that cardiac condition must be considered together with Sheehan's cardiac neurosis, a subject to which I now return.

78. On March 31, 2001, Sheehan suffered from a cardiac neurosis. He suffers from that illness today. In making that finding I accept the testimony of Dr. Prati, quoted at ¶¶ 49 and 54. MetLife offered no medical evidence to the contrary. The written report of MetLife's consulting psychiatrist, Dr. Givens, derived from Sheehan's medical records a "primary diagnosis" of "depression and anxiety," Pl.Ex. 5 at page AR 0688, but says nothing about cardiac neurosis.

79. Sheehan's comorbid illnesses of coronary artery disease and cardiac neurosis rendered him totally disabled within the meaning of the Certificate on March 21, 2003. It renders him totally disabled today. That is the testimony of the two treating physicians, Drs. Charno and Prati, and I accept their opinions. MetLife's medical evidence fails to squarely address this issue. That failure results from Dr. Stein's narrow focus upon Sheehan's cardiac condition to the exclusion of any psychiatric condition,[20] and Dr. Givens's narrow focus upon Sheehan's psychiatric condition to the exclusion of any cardiac condition. Both Dr. Stein and Dr. Givens were expressing opinions about a patient who did not and does not exist. Sheehan did not suffer from a cardiac condition alone or from a psychiatric condition alone. He suffered, and suffers, from both. As the result of comorbidity, Sheehan is affected by "a confluence of factors contributing to sickness," in Dr. Charno's phrase; "a very vicious cycle," in Dr. Prati's phrase. That confluence, that cycle, disables Sheehan.

80. In contending that Sheehan was not and is not disabled, MetLife also relies upon the surveillance video tapes of certain of Sheehan's activities in Florida. The tapes were shot in April 1999, May 2000, and August 2000. They show Sheehan, usually in the company of his wife, walking briskly or jogging for several long blocks, sometimes carrying packages, on occasion waving to unseen persons out of camera range, and on one tape interacting with and directing moving men from a van, with no discernible manifestations of fatigue, shortness of breath, or chest pain. These tapes, while probative, are not determinative of the issues. They do not show that Sheehan does not have coronary artery disease; Sheehan is exercising in ways that cardiologists recommend for that condition. The tapes support an inference that Sheehan was not suffering chest pains or shortness of breath at the times they were shot, but not that he does not have these symptoms intermittently. The tapes certainly do not show that Sheehan is not depressed or anxious. His expressions are almost uniformly glum; Mrs. Sheehan, walking or jogging along beside him, can be seen repeatedly attempting to initiate conversations with Sheehan, who appears to respond in monosyllables. On the tapes Sheehan is at his most animated when he converses with the moving men. Dr. Givens says this indicates that Sheehan "was capable of interacting socially," page AR 0689. But who of us has not yielded to depression when among family members, only to rally, to put our social best foot

---

20. That is certainly true of the opinions expressed in the Stein Letter. However, Dr. Stein acknowledged in his trial testimony that if a patient presented to him with the mental complaints voiced by Sheehan, Dr. Stein would refer the patient to a "cardiac psychologist." *See* ¶ 59, *supra*. Dr. Stein is also familiar with cardiac neurosis, but he did not evaluate Sheehan for that condition. *Id.*

forward, in the company of strangers? Lastly, the tapes tell nothing about the effect of Sheehan's two comorbid illnesses upon his ability to hold full-time employment.

81. Sheehan's past and present total disability as the result of the combined effect of two comorbid illnesses is clearly established by the medical evidence, Sheehan's trial testimony, and his demeanor. I accept the opinions of Dr. Charno and Dr. Prati on the subject of comorbidity-caused total disability because the testimony of these two treating physicians is worthy of belief, clinically sound, and not addressed or contradicted by the opinions of MetLife's medical experts, who focused solely upon Sheehan's cardiac or and psychiatric conditions and did not discuss comorbidity. Not every heart attack survivor develops a cardiac neurosis. Probably most do not. On that point, I accept Dr. Stein's testimony that "I have seen literally thousands of patients with the degree of *coronary disease* that he has, and I have never before seen someone who couldn't stand and work for an eight-hour day." Tr. 257 (emphasis added). But Dr. Stein did not say and was not asked whether any of these thousands of patients happily returning to work were also suffering from a cardiac neurosis. Dr. Stein did testify, however, that cardiac neurosis is a recognized condition and that if a cardiac patient was presented with Sheehan's complaints of depression, fear of death, and persistent fatigue, he would refer him to a "cardiac psychologist" for evaluation, presumably before recommending that the patient return to full-time work. In this case, Dr. Prati, a psychiatrist, fulfills the function of the cardiac

psychologist Dr. Stein envisioned. I also accept Sheehan's testimony describing his present symptoms and concerns. I consider it likely that the hours Sheehan spent on a gurney at Lenox Hill Hospital waiting for his physician to arrive and paying attention to his cardiac symptoms traumatized Sheehan and laid the foundation for his present fear of death, triggered by his recurring chest pains.[21] Sheehan's demeanor at the trial, during the days he sat in the courtroom watching other witnesses testify and when he testified himself, gave the impressions of depression, anxiety, and a lack of what for a better word I will call joy. As noted *supra,* Sheehan testified that he did not attend a trial day because of chest pains. He was either making that up for dramatic effect and to bolster his case, or he had chest pains. I find it was the latter, and that the pains frightened Sheehan. I find on all the evidence that on March 31, 2001, and at the present time, Sheehan was and is totally disabled from full-time employment as the result of the combined effect of two comorbid illnesses: coronary artery disease and cardiac neurosis.

82. This finding of total disability does not entitle Sheehan to a judgment against MetLife. Sheehan must also show that his disability is covered by the Plan. Because that issue presents mixed questions of fact and law, I deal with them in Part III, which contains the Court's Conclusions of Law and some additional Findings of Fact.

### III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this action and personal jurisdiction over the parties.

---

**21.** This finding should not be read as a criticism on my part of the treatment Sheehan received from his then treating physician or Lenox Hill Hospital. Those issues were involved in Sheehan's separate suit for medical malpractice. I mention Sheehan's experience here because his reactions to it provide a basis for a rational inference concerning a cause of his cardiac neurosis. Sheehan testified about his Lenox Hill Hospital experience that "I almost died there. And when you do that once, every chest pain goes back to the same place." Tr. 469.

■ 2. ERISA requires employers to furnish employees with summary forms of benefit plans describing, *inter alia*, "circumstances which may result in disqualification, ineligibility, or denial of benefits." *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir.1990), *citing* 29 U.S.C. § 1022. "Thus, the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supersede the terms of the Booklet would defeat the purpose of providing the employees with summaries." *Id.* at 907–08. More recently the Second Circuit has held that "[w]here the terms of a plan and the SPD conflict, the SPD controls. This may be startling at first blush but it makes sense when it is recalled that the SPD 'will be an employees' primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary.'" *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 110 (2d Cir.2003), *quoting Heidgerd*, 906 F.2d at 907. Moreover, "[t]he statute and the DOL regulations place the burden on employers to draft an SPD that is accurate, comprehensible, and clear regarding restrictions on eligibility for benefits. The consequences of an inaccurate SPD must be placed on the employer." *Id.* at 113 (citations omitted).

3. In the case at bar, the Booklet which the evidence shows Bear Stearns distributed to its employees, including Sheehan, is an SPD of the sort mandated by ERISA. Sheehan was and is entitled to rely upon its descriptions of his disability benefits and any restrictions on his eligibility to receive them. As for the Certificate prepared by MetLife, the evidence does not allow findings of when Sheehan received a copy or from whom, *see* Part II ¶ 26, *supra*. If the case should turn upon Sheehan's awareness of the eligibility restrictions contained in the Certificate, MetLife bore the burden of proving that awareness, *Burke*, 336 F.3d at 114, *citing and quoting with approval Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.*, 21 F.Supp.2d 284, 297 n. 7 (S.D.N.Y.1998), and failed to it.

■ 4. There is a conflict between the Certificate and the Booklet with respect to restrictions imposed upon Sheehan's eligibility for benefits for a disability related to "a mental or nervous disorder" (the phrase appearing in the Certificate) or "a mental or nervous condition" (the phrase appearing in the Booklet). That conflict does not lie in the different nouns, "disorder" and "condition"; in the present context they are synonymous. Rather, the conflict lies in the effect of the disorder (or condition) upon Sheehan's eligibility for benefits. The Certificate provides that no monthly benefits will be paid "for any part of the Secondary Benefit Period during which you are not confined as an inpatient in a Hospital, if your Total Disability *in any way* results from, or is caused *or contributed to* by a mental or nervous disorder." ¶ 2.2(ii) (emphasis added). The italicized language allows MetLife to assert—indeed, it did assert in its notice of termination—that Sheehan's cardiac neurosis contributed to any disability he had, thereby depriving him of eligibility during the Secondary Benefit Period. Since the Secondary Waiting Period began after the 90–day Waiting Period followed by the two-year Primary Benefit Period, Sheehan's eligibility, on MetLife's argument based on the Certificate, had run out before the notice of termination. In contrast, the Booklet on page 14 provides that "[i]f your disability is *the result* of a mental or nervous condition," benefits will be paid "for a maximum of 24 months" unless the employee is hospitalized. That wording

makes it more difficult for MetLife to argue that eligibility for benefits is lost if a mental or nervous condition does no more than "contribute to" a disabling condition. To the extent that these restrictions on eligibility conflict, the Booklet trumps the Certificate under the holdings in *Heidgerd* and *Burke*.

■ 5. However, a deficiency in an SPD's description of the underlying plan's restrictions on benefits does not automatically allow the employee to disregard the plan restrictions. In order to take advantage of a deficient SPD, an employee suing under ERISA must show prejudice resulting from the deficiency. That is the second holding in *Burke*, which resolved prior uncertainty in this circuit. The Second Circuit said in *Burke:*

> The circuits are divided over whether detrimental reliance or prejudice is required to recover in deficient SPD cases. The Third, Seventh and Eleventh Circuits require detrimental reliance. These courts generally require an affirmative showing by the plaintiff that he read the SPD and but for the inaccurate description he would have acted differently. The First, Fourth, Eighth and Tenth Circuits allow recovery upon a showing of *either* reliance *or* prejudice. The Fifth and Sixth Circuits in *dicta* would require neither reliance nor prejudice.
>
> This Court has not squarely decided what the appropriate standard is. As a result, there is disagreement in the district courts of this Circuit over the proper legal standard. To promote consistency, we must now decide the appropriate standard.

363 F.3d at 112 (citations omitted) (emphasis in original). After an extended analysis, the *Burke* court announced its standard:

> Cognizant of ERISA's distribution of benefits, we require, for a showing of

prejudice, that a plan participant or beneficiary was *likely* to have been harmed as a result of a deficient SPD. Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error.

*Id.* (emphasis in original).

■ 6. In the case at bar, Sheehan cannot make the requisite initial showing that he was "likely to have been harmed" by the differences between the SPD and the Certificate. His inability in that regard is made manifest by the circumstances in which the Second Circuit in *Burke* found the showing had been made. In that case the plaintiff, a Mrs. Burke, was the surviving domestic partner of a deceased employee. The plan of Kodak, the defendant company, provided for survivor income benefits ("SIB") for domestic partners, but conditioned a surviving partner's eligibility for the benefits upon the couple filing an affidavit on a company form attesting to their relationship. The SPD described the plan's survivor income benefits, but failed to mention the affidavit requirement. The company denied benefits because the affidavit had not been filed. The Second Circuit held that plaintiff was entitled to recover. As previously noted, the Second Circuit first held that "[b]ecause the relevant section of the SPD omits the affidavit requirement, it conflicts with the Plan. Thus, the SPD controls." 336 F.3d at 111. As for a showing of likely prejudice to plaintiff and her late partner, the court of appeals concluded on the evidence that "[t]he conspicuous absence of the domestic partnership affidavit requirement in the self-contained SIB section likely led the Burkes to believe that an affidavit was unnecessary for SIB benefits." *Id.* at 114. Moreover, "the evidence in the record is inadequate to rebut the presumption of prejudice to the Burkes. Due to

Kodak's omission, the Burkes were more likely to believe that there was no affidavit prerequisite for SIB." *Id.* And the Second Circuit further reasoned:

> Finally, the record affirmatively supports a finding of likely prejudice. Mr. Burke designated Mrs. Burke as the primary beneficiary of his Kodak-provided life insurance, his Savings and Investment Plan Account, and his Employee Stock Ownership Plan Account. Therefore, his forfeiture of substantial lifetime benefits for his disabled domestic partner, and later spouse, is belied by his prudence in other Kodak benefits decisions.
>
> Applying a likely prejudice standard for deficient SPD cases, we conclude that the Burkes suffered prejudice as a result of Kodak's deficient SPD.

*Id.*

7. In *Burke* the Second Circuit derived its "likely prejudice" standard from Judge Mukasey's opinion in *Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.*, 21 F.Supp.2d 284 (S.D.N.Y.1998), which the Burke court cited as providing "a useful illustration," quoted approvingly, and followed. 336 F.3d at 113–114. In *Manginaro*, the plan imposed a two-year statute of limitations on legal actions against an employee welfare fund. The SPD, however, omitted any mention of that statute of limitations. The normal statute of limitations under New York law would have been six years. Plaintiff did not file suit within the two-year plan limitation period, and the fund rejected his claim for that reason. Judge Mukasey, finding for the plaintiff, first ruled that the SPD trumped the plan and then, on the question of prejudice, reasoned that "had the Fund adequately disclosed the two-year limitation via the SPD, it is likely that [plaintiff] would have learned of this limitation from his employer, his co-workers, or the union, even if he never read the SPD himself." *Manginaro*, 21 F.Supp.2d at 296.

8. The rule to be derived from *Burke* and *Manginaro* is that in an ERISA action, likely prejudice to a plaintiff will be presumed if, as the result of an SPD deficiency, he was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action. Sheehan cannot bring himself within those cases. I have found that he was and is disabled. But the Certificate contains restrictions on Sheehan's eligibility for disability benefits; and whatever deficiencies existed in the SPD's description of those restriction, there is nothing in the evidence to suggest that, had he known of them, Sheehan would have acted in such a way as to avoid the effect of the restrictions. In short, Sheehan cannot show a likely prejudice ascribable to a deficient SPD.[22]

---

**22.** This construction of *Burke* was adopted by the district court in *Layaou v. Xerox Corp.*, 330 F.Supp.2d 297 (W.D.N.Y.2004). Plaintiff brought an ERISA action challenging Xerox's calculation of his pension benefits. The SPD's description of those benefits was deficient. Judge Larimer observed that in *Burke* the Second Circuit "adopted a standard of 'likely prejudice' in deficient-SPD cases," *id.* at 301, and held that the plaintiff had made that showing because the SPD "would clearly have misled him into believing that his monthly benefit would be considerably higher than it turned out to be. That mistaken belief would likely have affected plaintiff's financial planning for his upcoming retirement, and defendants have not presented any evidence to show that plaintiff was in fact aware of the 'phantom account' prior to his retirement." *Id* at 304. The court concluded that "plaintiff has established 'likely prejudice' as a result of the faulty SPD, and that defendants have not rebutted that showing." *Id.* As in *Burke* and *Manginaro*, the plaintiff in *Layaou* was able to show that if the SPD had not been deficient he could and probably would have taken action to improve or protect his interests. Sheehan cannot make that showing.

■ 9. It follows that the Certificate, which I treat as the Plan, governs Sheehan's eligibility for disability benefits after the 24 months provided for by the Primary Benefit Period. That is so, whether or not or when Sheehan received a copy of the Certificate. Sheehan is not eligible for benefits after the Primary Benefit Period if, again quoting the language of the Certificate, his disability "in any way results from, or is caused or contributed to by a mental or nervous disorder."

10. In summation, counsel for MetLife argued that the effect of this provision is that if Sheehan's "disability is mental in nature and *absent that mental disability* he would not be disabled from working, he is not entitled to disability benefits." On the other hand, "[i]f he has a cardiac condition and that cardiac condition *by itself* would constitute a total disability within the meaning of the plan, he gets benefits," even though the cardiac condition caused the concurrently existing mental disability of cardiac neurosis. Tr. 502–03 (emphasis added). Counsel for Sheehan argued in summation that the evidence does not show that Sheehan has suffered or is suffering from "a mental or nervous disorder"; rather, counsel submits, Sheehan's disabling conditions are entirely physical in nature:

> So now, he gets chest pain from his coronary artery disease, and this causes him stress and worry. This stress and worry, they're telling you, is a mental condition. That's not a mental condition. That's part and parcel of his physical condition. This is not a hypochondriac who is imagining this. He has coronary artery disease that causes him

pain, and he worries about it, and he stresses over it. That's not a mental condition.... He has cardiac neurosis which he's being treated for, a psychiatrist speaks to him about [it] so he can calm him down. That's not a mental condition. This is what they're telling you, Judge. It's common sense. It's not a mental condition. It's stress from his heart attack.

Tr. 550.[23]

11. The argument of plaintiff's counsel, forcefully made, finds surface support in Dr. Prati's testimony that Sheehan's heart attack, a physical occurrence, caused his cardiac neurosis. Grammatical usage and common sense teach that this is why the noun "neurosis" is modified by the adjective "cardiac." Dr. Stein's testimony makes it clear that not all heart attack patients develop a cardiac neurosis. But when that complication occurs, as unfortunately it did in Sheehan's case, I find myself unable to agree with plaintiff's counsel that the resulting "cardiac neurosis" is not "a mental condition." It seems to me that the *physical* cause of a cardiac neurosis does not make the condition any less a *neurosis*. It is difficult for Sheehan to argue that he does not suffer from a mental disorder when Dr. Prati diagnosed him as suffering from cardiac neurosis and testified that this condition is listed in that psychiatric Rosetta Stone, the professionally compiled and edited "DSM," or "The Diagnostic and Statistical Manual of *Mental Disorders.*" I must therefore conclude that Sheehan's cardiac neurosis is "a mental or nervous disorder," as that phrase is used in the Certificate. To hold otherwise

23. At another point in his summation, counsel for Sheehan argued that the Plan language relating to a mental or nervous condition was "open to more than one meaning," and accordingly ambiguous and to be construed against MetLife under the familiar maxim *contra proferentem.* Tr. 543. It is apparent, however, that counsel was referring to the language in the Booklet, not the Certificate; and, for the reasons stated in text, the Certificate controls. Furthermore, I am unable to discern any ambiguity in the relevant provisions of the Certificate.

would deprive MetLife of a limitation of disability benefits which it included in the Policy issued to Bear Stearns.

12. It follows that counsel for MetLife is correct in his submission that where comorbidity exists between coronary artery disease and cardiac neurosis, entitlement to disability payments under the Plan exists only if the "cardiac condition by itself would constitute a total disability." This conclusion requires further Findings of Fact.

13. Sheehan has carried his burden of proving that his coronary artery disease totally disabled him up to and including June 12, 2003, the date when the "critical" [24] 80% stenosis (blockage) of his right coronary artery was successfully treated with a stent. Prior to that time, Sheehan's recurrent chest pains, as evidenced by his hospitalizations at the Cleveland Clinic Hospital in 1997 and 1998, the latter resulting in a diagnosis of unstable angina, and his attendant shortness of breath and chronic fatigue, all of which may reasonably be ascribed to increasing arterial stenosis leading to the June 2003 surgical procedure, combine to demonstrate Sheehan's total disability as the result of a cardiac condition, standing alone. Up to that point in time, I accept Dr. Charno's testimony that Sheehan's cardiac condition was totally disabling.

14. I stress in connection with this finding that Dr. Stein, the cardiologist upon whose opinions MetLife relied at trial, focused upon Sheehan's cardiac condition as of June 17, 2004, the date of the Stein Letter. As the quotations from that Letter indicate, in concluding that "Mr. Sheehan is clearly capable of working full-time without physical limitation" Dr. Stein placed significant (if not critical) reliance upon the most recent tests and evaluations of Sheehan's cardiac condition, performed in December 2003. This was, of course, six months after the insertion of the stent in the right coronary artery in June 2003. With respect to that procedure and the subsequent tests, Dr. Stein testified at trial that "by the time he's had the second or following the second angioplasty, we now have examinations that show that he has no residual blockages in the coronary arteries. So there's no concern that he's got a blockage there where he's going to develop symptoms, if he stresses himself or exercises." Tr. 267. That testimony speaks to Sheehan's cardiac condition today, but not to the time prior to the June 2003 procedure, when a dangerous coronary artery blockage was building up. [25]

15. Sheehan has not proved that subsequent to the June 2003 surgical procedure, his cardiac condition in and of itself is totally disabling. In that regard I accept Dr. Stein's opinion with respect to Sheehan's cardiac condition as of June 2004, as demonstrated by the tests and evaluations in December 2003. The evidence from that period shows that Sheehan then had, and now has, "nonobstructive" coronary heart disease and a "moderately decreased" left ventricular function measured by the ejection fraction. Dr. Stein's opinion is that evaluating Sheehan's ability

---

24. I think that in describing this blockage, Dr. Musial's adjective "critical" is more apt than Dr. Stein's adjective "significant."

25. I recognize that Dr. Patel, the cardiologist consulted by MetLife prior to terminating Sheehan's benefits, submitted a written report to MetLife dated September 17, 2000 expressing the opinion that Sheehan did not have a cardiac-caused disability at that time. Dr. Patel did not examine Sheehan. MetLife did not call Dr. Patel as a witness at trial, preferring to address Sheehan's cardiac history and condition through the opinions of Dr. Stein, and so Dr. Patel was not subjected to cross-examination. While Dr. Patel's report is part of the administrative record and may be considered by the Court, I give substantially more weight to the trial testimony of Dr. Charno, Sheehan's treating cardiologist.

to work based upon his cardiac condition alone, and without any regard to any psychiatric condition, Sheehan would be capable of full-time employment without physical limitations. I am persuaded by that opinion. To the extent that at the trial Dr. Charno expressed a contrary view on that precise question, I cannot accept it. I do not question that Sheehan is still troubled by chest pains, shortness of breath, and fatigue. But Sheehan's paralyzing and disabling concerns—his fear of death, for example—stem from his cardiac neurosis, which in turn exacerbates his physical symptoms; this is the "vicious cycle" described by Dr. Prati. Very nearly a year had elapsed between the last tests on December 1 and 2, 2003 and the beginning of trial on November 15, 2004, and there is no evidence of more recent hospitalizations for chest pain, or clinical tests showing the presence of ischemia, coronary artery stenosis, or failing ventricular function. It is quite apparent that without the comorbid contribution of Sheehan's cardiac neurosis to his condition, he would not presently be totally disabled. It follows that while Sheehan is today totally disabled as that phrase is used in the Plan, his disability is the result of the combined effect of two comorbid illnesses: coronary artery disease and cardiac neurosis. This means that Sheehan's disability is "contributed to" by cardiac neurosis, a "mental or nervous disorder," as those phrases are used in the Plan. In those circumstances, Sheehan is not entitled to disability benefits during the period in question, at the present time, or in the future, so long as his conditions do not change.

16. For the foregoing reasons, the Court concludes:

(a) Plaintiff is entitled to recover from defendant past disability benefits payments for the period from March 31, 2001 to and including June 12, 2003.

(b) Plaintiff is not entitled to recover from defendant past disability benefits subsequent to June 12, 2003, or to a declaration that he is entitled to future benefits.

On or before March 31, 2005, counsel for plaintiff are directed to settle a Judgment consistent with this Opinion on seven (7) business days' notice.

It is SO ORDERED.